******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ZACHARY JAY ELSON
(SC 18737)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh, McDonald and
Espinosa, Js.*

*Argued September 24, 2012—officially released June 3, 2014*

*Hubert J. Santos*, with whom, on the brief, were *Hope C. Seeley*, *Benjamin B. Adams* and *Jessica M. Santos*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Warren C. Murray*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. This certified appeal raises several significant issues concerning the review of unpreserved claims under both *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and our supervisory authority over the administration of justice, in connection with the well established constitutional principle that "the [a]ugmentation of sentence based on a defendant's decision to stand on [his or her] right to put the [g]overnment to its proof rather than plead guilty is clearly improper." (Internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 81, 770 A.2d 908 (2001). The defendant, Zachary Jay Elson, appeals, upon our grant of his petition for certification,[1] from the judgment of the Appellate Court affirming the judgment of the trial court, rendered after a jury trial, convicting him of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and committing an offense while on pretrial release in violation of General Statutes § 53a-40b (1).[2] *State* v. *Elson*, 125 Conn. App. 328, 331, 9 A.3d 731 (2010) (en banc). The defendant claims, inter alia, that: (1) the Appellate Court improperly declined to review, under *Golding*, his unpreserved claim that the trial court improperly penalized him for exercising his right to a jury trial, as indicated by the court's comments at sentencing; and (2) given the adverse effect of such comments on the public perception of our criminal justice system, this court should exercise its supervisory authority to vacate his sentence and remand the case for resentencing. Because we overrule the requirement, articulated in, inter alia, *State* v. *Ramos*, 261 Conn. 156, 171, 801 A.2d 788 (2002), that a party must "affirmatively request" *Golding* review in its main brief in order to receive appellate review of unpreserved constitutional claims, we conclude that the Appellate Court improperly declined to review the defendant's constitutional claims on that ground. We then reach the merits of the defendant's constitutional claims and conclude that under *State* v. *Kelly*, supra, 81–82, the defendant has not established that the trial court penalized him for exercising his right to a jury trial. Finally, however, we agree with the defendant that the use of our supervisory authority is warranted in order to prevent the adverse implications on the public's perception of the procedural fairness of the criminal justice system that arise when a trial judge refers to, and could appear to have considered, a defendant's decision to exercise his right to a trial. Accordingly, we reverse in part the judgment of the Appellate Court.

The record and the Appellate Court opinion set forth the following relevant facts and procedural history. On September 3, 2004, the defendant, who was intoxicated, entered a classroom at Western Connecticut State Uni-

versity and made a romantic overture toward the victim, who was a student working alone on an art project. *State* v. *Elson*, supra, 125 Conn. App. 331–33. After the victim rebuffed him, the defendant left the classroom, only to return shortly thereafter, threaten her with a knife and then physically assault her, causing numerous physical injuries to her fingers, right hand, arm and face, some of which required surgical treatment.[3] Id., 332–34.

The state subsequently charged the defendant with assault in the first degree in violation of § 53a-59 (a) (1), attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59 (a) (1), unlawful restraint in the first degree in violation of § 53a-95 (a), and committing an offense while on pretrial release in violation of § 53a-40b (1). After trial, the jury returned a verdict of guilty on the charges of assault in the first degree and unlawful restraint in the first degree.[4] After the jury returned its verdict, the defendant entered a plea of guilty on the charge of committing an offense while on pretrial release. The trial court subsequently rendered judgment in accordance with the jury's verdict and the defendant's plea.

Thereafter, the trial court conducted a sentencing proceeding, which forms the basis for the claims in this certified appeal. "At the commencement of the proceeding, the prosecutor addressed the court, ultimately recommending a total effective sentence of thirty-five years incarceration, suspended after twenty-five years, followed by five years probation with special conditions. Thereafter, the victim read an impact statement she had written.[5] The defendant's attorney addressed the court, suggesting that the court consider factors that supported a lenient sentence. The court listened to statements made by a family friend of the defendant as well as the defendant's father. The defendant exercised his right of allocution, expressing remorse for the criminal conduct underlying his convictions. He stated in relevant part: 'I'd like to apologize to [the victim] and her family . . . . I've hurt you, I've terrified you, and I've destructed your sense of security, viciously. What I did was horrible, and from the bottom of my heart I'm so sorry for what I did to you and your family. I know I probably can't make it okay right now, but I'm going to do my best. And, again, I'm just so sorry. I'd also like to apologize to the court and also [to] the [Western Connecticut State University] community because in violating one of their student's safety and security—and I violated all of this. I'd also like to apologize to my family. I wish I hadn't done this to any of them.'

"Thereafter, the court stated that it would 'make some introductory remarks before [proceeding] to formal sentencing.' At that time, the court indicated that it had considered a letter submitted to the court from the defendant's mother and the statement of the defen-

dant's father. The court then stated: '*We've all heard the defendant's apology. I don't know how sincere it is, but it is certainly unfortunate that it comes so late in the process. If the defendant had been truly apologetic, he wouldn't have put the victim through the trial. To a large extent, it seems to me that the defendant's apology represents thinking of himself rather than the victim.*'

"The court discussed the victim's 'credible' trial testimony, noting that '[t]here is no reason in my mind to doubt her testimony that the defendant came at her from behind with a knife to her throat.' The court stated: 'A person intends the natural consequences of his acts. And the natural consequences of that act is to cause serious physical injury. [The] [d]efendant came about six inches away from killing this young woman or completely ruining her life; for that, I suppose, the victim and the defendant should both consider themselves fortunate.

" 'As the state correctly points out, the victim was totally blameless. This is not a case in which the victim knew the defendant, provoked the defendant, enticed the defendant or did anything to threaten the defendant. The victim bears no part of the blame for this incident. Despite that, the defendant threatened to rob [the victim] of the prime of her life. He threatened to rob the victim of being a wife, a mother, an adult daughter, a college educated artist or a person with some other promising career. Thus, it is fully appropriate that I take away the defendant's liberty during the prime of his life.

" 'The defendant's defense was intoxication. There is no question that the defendant had been drinking to an excess on September 3, 2004. But the defendant is responsible for his own actions. He had been through a well-known alcohol rehabilitation program, undoubtedly paid for by his caring parents, and thrown away all the good that this program had done him.

" 'On the day in question, the defendant put a . . . knife with a six inch blade in his pants as he walked into [Western Connecticut State University]. Why did he do that?

" 'Even if the defendant had drunk to an excess, there must be some deep-seated anger within the defendant that explains this act of rage and violence, which the state aptly points out appears to be part of a pattern. This, in my view, makes the defendant a dangerous person, one from whom the victim, [Western Connecticut State University], and society should be protected.

" 'It also points out, incidentally, the dangers of substance abuse. There's no evidence, I don't think, that the defendant was using drugs on the day in question, but he does have a history of drug and alcohol abuse and . . . it has long been clear to me that drug and alcohol abuse is not a victimless crime. And today's

sentencing provides graphic evidence of that.

" 'Furthermore, intoxication simply does not explain his statement to the police and his testimony in court that this was an accident. Did the accident supposedly occur because of intoxication? I never understood that. But I do know that this was no accident. I do not believe the defendant's testimony that he just happened to get poked in the leg with his knife, that he just happened to pull the knife out at that time and that [the victim] just happened to turn around at that time. *I believe the defendant gave a false explanation to the police, that he testified falsely in court and that he essentially obstructed justice in doing so. And this is an aggravating factor.*'

"The court observed that the defendant had committed the crimes at issue while he was released on bail after having been charged with other felony crimes. The court stated: 'A judge in Norwalk trusted the defendant and released him. The defendant abused that trust in the worst way. No judge has a crystal ball. We cannot tell for certain when we make bail decisions who will commit crimes while on bail and who will not. We make mistakes. But if we do not punish those who do commit crimes while given a privilege of release, we will not be doing all we can to deter others from abusing that privilege.

" 'By committing these crimes while out on bail, the defendant not only committed a crime against the victim but also committed a crime against the court. The defendant broke his word to the court and showed disrespect for the law. *The only mitigating factor I can find in this situation is that the defendant at least admitted the bail status violations.*[6] . . . [I]n due course, it will be entirely up to the judge in Norwalk to decide how to sentence in those cases. . . . [T]he current convictions are separate offenses from the ones in the Norwalk [court] . . . .' Thereafter, the court sentenced the defendant on each count, imposing a total effective sentence of twenty-five years imprisonment, execution suspended after twenty years, followed by five years of probation with special conditions. The sentencing proceeding concluded without any additional comments by defense counsel." (Emphasis added; footnotes added.) Id., 335–38.

The defendant appealed from the judgment of conviction to the Appellate Court, claiming, inter alia,[7] that the trial court "deprived him of his right to due process when it considered improper factors at the time of sentencing." *State* v. *Elson*, 116 Conn. App. 196, 235, 975 A.2d 678 (2009). Specifically, "[t]he defendant argue[d] that the court improperly considered (1) the fact that he proceeded to trial rather than accepting a plea bargain offered by the state and (2) the knife that was a full exhibit at the trial."[8] Id. In affirming the judgment of the trial court, the three judge panel of the Appellate

Court that initially heard the defendant's appeal, *Bishop*, *Harper* and *Dupont*, *Js.*, split three ways in addressing the sentencing claim. Id., 235–36. Judge Harper, authoring the lead opinion for the panel, declined to review the defendant's sentencing claim, concluding that it was unpreserved and that he had not properly made an "affirmative request" for review in his main brief under *State* v. *Golding*, supra, 213 Conn. 239–40. *State* v. *Elson*, supra, 116 Conn. App. 239–40. Judge Dupont concurred in the result, concluding that, although the defendant's sentencing claim was reviewable under the application of *Golding* in *State* v. *Wright*, 114 Conn. App. 448, 463, 969 A.2d 827 (2009), resentencing nevertheless was not required. *State* v. *Elson*, supra, 116 Conn. App. 241, 245–46. Judge Bishop dissented in part, agreeing with Judge Harper's conclusion as to reviewability under *Golding*, but concluding ultimately that "the defendant's sentencing claim raises a troubling issue warranting resentencing" under the Appellate Court's supervisory powers over the administration of justice. Id., 246–47.

Thereafter, the Appellate Court granted the defendant's motion for reargument and reconsideration en banc. *State* v. *Elson*, supra, 125 Conn. App. 331. The en banc Appellate Court majority concluded that the defendant had not properly made an "[affirmative] request" for *Golding* review of his unpreserved sentencing claim in his main brief and, therefore, declined to review that claim. Id., 356. In so concluding, the en banc Appellate Court interpreted that requirement to "eschew the notion that it necessarily includes the use of talismanic words or phrases, such as a citation to the *Golding* opinion or a recitation of any specific language from that opinion in an analysis of the reviewability of the claim." Id., 353. Rather, relying on our decision in *In re Melody L.*, 290 Conn. 131, 154, 962 A.2d 81 (2009), the Appellate Court determined that "what is required in making an affirmative request for review, is that a party present an analysis consistent with the principles codified in *Golding* for the review of unpreserved claims of constitutional magnitude. As a starting point, a party seeking review of such claim must alert the reviewing court to the fact that the claim is unpreserved or that there is a possibility that the reviewing court may determine that the claim is not properly preserved for appellate review. Thereafter, the party must, in its main brief, present an analysis based in law and tailored to the unique circumstances surrounding the claim that, if the reviewing court determines that the claim is not preserved, the claim nevertheless is reviewable on appeal because (1) the record is adequate to review the claim and (2) the claim is of constitutional magnitude, alleging the deprivation of a fundamental constitutional right." (Footnote omitted.) *State* v. *Elson*, supra, 125 Conn. App. 354. Further, the Appellate Court overruled its decision in *State* v. *Wright*, supra, 114 Conn. App.

463, to the extent that it supported the reviewability of the defendant's claims. *State* v. *Elson*, supra, 125 Conn. App. 359.

The Appellate Court majority then declined to use its supervisory authority over the administration of justice to reach the defendant's claims, noting that the defendant did not make that request until his reply brief and, therein, only skeletally. Id., 359–60. In dicta, the Appellate Court majority relied on *State* v. *Kelly*, supra, 256 Conn. 79–84, and concluded that the "totality of the circumstances" indicated that the trial court had not violated the defendant's due process rights by penalizing him at sentencing for having elected to stand trial.[9] *State* v. *Elson*, supra, 125 Conn. App. 365–66. The Appellate Court's en banc reconsideration of this case, which again affirmed the judgment of the trial court, resulted in numerous separate opinions, including an opinion concurring in part and dissenting in part issued by Judge Bishop; id., 388; a concurring opinion issued by Judge Robinson; id., 369; and an opinion concurring in part issued by Judge Dupont.[10] Id., 378. This certified appeal followed. See footnote 1 of this opinion.

Originally, we granted certification in this appeal solely to consider whether the defendant's briefing of his unpreserved sentencing claim in the Appellate Court constituted an adequate request for *Golding* review. See id. Following oral argument, however, we ordered the parties, sua sponte, to submit simultaneous supplemental briefs on the following issues, both of which had been raised in the defendant's petition for certification, but were not previously granted certification by this court: (1) "Should the doctrine of *State* v. *Golding*, [supra, 213 Conn. 233], apply to an unpreserved claim that a trial judge commented improperly during sentencing on the defendant's exercise of his constitutional right to a jury trial?" and (2) "Should this court exercise its supervisory powers in the present matter to vacate the defendant's sentence and remand the case to the trial court for resentencing?"

For reasons explained in greater detail subsequently in this opinion, we conclude that the defendant's briefing of his unpreserved sentencing claim in the Appellate Court constituted an adequate request for *Golding* review, because we overrule the "affirmative request" requirement as articulated in, inter alia, *State* v. *Ramos*, supra, 261 Conn. 171.[11] We further conclude that the defendant failed to carry his burden, under *State* v. *Kelly*, supra, 256 Conn. 81–82, of proving that the totality of the circumstances demonstrates that the trial court's comments at sentencing indicated that it had penalized him for exercising his right to a jury trial by lengthening his sentence. Finally, we answer the second supplemental issue in the affirmative and exercise our supervisory powers to order resentencing in the present case to prevent the potentially deleterious effect of such

remarks by a trial court on the public's perception of the procedural fairness of the criminal justice system.

## I

## CONSTITUTIONAL CLAIMS

We begin with the defendant's constitutional claims that we originally certified, namely, that: (1) the Appellate Court improperly concluded that his claims were not reviewable under *State* v. *Golding*, supra, 213 Conn. 239–40, because he had failed to make the necessary "affirmative request" for such review; and (2) *Golding* review and relief was necessary because "the trial court's consideration of 'put[ting the victim through the trial' infringed on the defendant's state and federal constitutional rights, and warrants a remand from this court for resentencing."

## A

## Affirmative Request Requirement

With respect to reviewability, the defendant contends that the Appellate Court should have reviewed his claim because his briefing demonstrated that the first two prongs of *State* v. *Golding*, supra, 213 Conn. 239–40, which pertain to reviewability, had been satisfied. The defendant further contends that the line of cases establishing the "affirmative request" rule, as interpreted by the en banc Appellate Court, "unduly restrict[s] a defendant's ability to present legitimate but unpreserved claims of a deprivation of a fundamental constitutional right." He relies on Judge Dupont's concurrence in the present case, and the Appellate Court's opinion in *State* v. *Wright*, supra, 114 Conn. App. 448, as establishing that the affirmative request requirement has a "shaky foundation" in this court's case law. He further argues that, consistent with the concurring opinion authored by Justice Palmer in *Johnson* v. *Commissioner of Correction*, 288 Conn. 53, 68, 951 A.2d 520 (2008), we should interpret the affirmative request requirement consistently with *Wright*; see *State* v. *Wright*, supra, 463–64; to avoid "unjust results, and diminish[ing] a defendant's right to effective appellate review of otherwise fully-analyzed claims." Thus, the defendant contends that we should review unpreserved constitutional claims pursuant to *Golding*, regardless of a brief's failure to request that level of review by name or by tracking the party's entitlement thereto, if the requesting party has "present[ed] a record that is [adequate] for review and affirmatively [demonstrates] that his claim is indeed a violation of a fundamental constitutional right." (Internal quotation marks omitted.) *State* v. *Wright*, supra, 463.

In response, the state endorses the en banc Appellate Court's interpretation of the "affirmative request" requirement as "embod[ying] long-standing and well-settled principles of notice and adequate briefing," and contends that the approach in *Wright*, advocated by

the defendant, is deficient because it does not alert the court of appeal that review of an unpreserved claim is being requested. The state further contends that *Wright*: (1) "fails to draw any meaningful distinction between preserved and unpreserved claims of error," thus "remov[ing] any meaningful consequence of not contemporaneously objecting to a perceived error at trial"; and (2) "effectively transforms the defendant's burden of demonstrating his entitlement to extraordinary review into the state's burden of disproving such entitlement." Finally, the state contends that the rule adopted by the en banc Appellate Court in the present case has the salutary effect of being consistent with this court's approach "in cases in which a party seeks review of a state constitutional claim" under *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992). We agree, however, with the defendant, and conclude that the analysis contained within *State* v. *Wright*, supra, 114 Conn. App. 448, embodies the proper approach to determining the reviewability of claims under *Golding*. We further conclude that, because the approach embodied in *Wright* is inconsistent with the affirmative request requirement as it has been implemented in this court's case law, the decision of this court in *State* v. *Ramos*, supra, 261 Conn. 171, along with its progeny, should be overruled insofar as those cases require a request for *Golding* review to be made in some particular manner beyond the adequate briefing of a constitutional claim.[12]

Consideration of the continuing vitality of the affirmative request requirement must begin with a review of what the Appellate Court aptly described as the "bedrock principle of appellate jurisprudence" that this court generally will not review unpreserved claims made for the first time on appeal." *State* v. *Elson*, supra, 125 Conn. App. 340–41. Specifically, in *State* v. *Evans*, 165 Conn. 61, 69, 327 A.2d 576 (1973), this court stated that "[o]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court." One of those " 'exceptional circumstances' " is "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." Id., 70.

As this court later recognized, however, the *Evans* standard lent itself to "inconsistent application" as evidenced by the "disparate approaches" by this court and the Appellate Court to "the *Evans* criteria." *State* v. *Golding*, supra, 213 Conn. 239. Accordingly, in *Golding*, this court refined the *Evans* framework, articulating "guidelines designed to facilitate a less burdensome, more uniform application of the . . . *Evans* standard . . . ." Id. Specifically, *Golding* held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magni-

tude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; footnote omitted.) Id., 239–40. "[T]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable"; (internal quotation marks omitted) *State* v. *Whitford*, 260 Conn. 610, 621, 799 A.2d 1034 (2002); and under those two prongs, "[t]he defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error." *State* v. *Golding*, supra, 240.

We first alluded to an expansion of the defendant's burden to demonstrate entitlement to review under *Golding* in *State* v. *Waz*, 240 Conn. 365, 692 A.2d 1217 (1997), which involved an unpreserved state constitutional claim. The state argued that this court should decline to review the claim because the defendant made "no express reference to the guidelines governing our review of unpreserved constitutional claims set forth in *State* v. *Golding* [supra, 213 Conn. 239–40]." *State* v. *Waz*, supra, 371 n.11. Notwithstanding the defendant's "failure to invoke our review under the criteria specified in *Golding*," we reached the merits of the claim, but "admonish[ed] defendants who seek consideration of unpreserved constitutional claims . . . that they bear the burden of establishing their entitlement to such review under the guidelines enumerated in *Golding*."[13] Id. Thus, in *Waz* this court appeared to read the first two prongs of *Golding* not merely as setting forth uniform rules governing entitlement to review of unpreserved constitutional claims, but also as requiring a defendant specifically to invoke that entitlement in his brief—as opposed to briefing only the merits of the constitutional claim itself—unless, as in *Waz*, the record otherwise is clear that the defendant is entitled to review of that claim. Subsequent to *Waz*, this court declined on multiple occasions to reach unpreserved constitutional claims when the appellant expressly failed to seek review under *Golding*. See, e.g., *State* v. *Andresen*, 256 Conn. 313, 323–24, 773 A.2d 328 (2001) (sufficiency of evidence to support conviction for selling unregistered securities); *Ghant* v. *Commissioner of Correction*, 255 Conn. 1, 17, 761 A.2d 740 (2000) (claim of state constitutional right to appeal).

Subsequently, in *State* v. *Ramos*, supra, 261 Conn. 171, the affirmative request requirement made its appearance for the first time in our case law. In *Ramos*, we quoted this passage from *Waz*, namely, that defendants "bear the burden of establishing their entitlement to such review under the guidelines enumerated in *Golding*"; (internal quotation marks omitted) id., quoting *State* v. *Waz*, supra, 240 Conn. 371 n.11; in support of the proposition that a "party is obligated . . . *affirm-*

*atively to request* review under" either *Golding* or the plain error doctrine. (Emphasis added.) *State* v. *Ramos*, supra, 171. In *Ramos*, we then declined to review the defendant's "claim that the trial court's [jury] instruction on provocation was defective." Id., 171–72. In support of this decision, we cited *Ghant* v. *Commissioner of Correction*, supra, 255 Conn. 17, for the proposition that it is "inappropriate to engage in [a] level of review not requested," and noted that the defendant had "requested neither *Golding* nor plain error review." *State* v. *Ramos*, supra, 171–72.

The decisions of this court following *Ramos* repeatedly used the term "affirmative request" in describing the obligation to invoke *Golding* review. Although none of those cases ever explained that term specifically, those opinions nevertheless implied that a requesting party was required to cite *Golding*, or at the very least engage in a threshold layer of briefing demonstrating the party's entitlement to *Golding* review. See, e.g., *In re Melody L.*, supra, 290 Conn. 154 ("[T]he respondent does not seek a review under *Golding*. Her brief makes no mention of, or request for *Golding* review. Consequently, we decline to review the respondent's constitutional claims."); id. (noting that constitutional claim was inadequately briefed so "therefore [we] could not address this claim even if *Golding* review had been sought"); *State* v. *McKenzie-Adams*, 281 Conn. 486, 533 n.23, 915 A.2d 822 (declining to reach unpreserved confrontation clause claim after concluding claim was inadequately briefed because "the defendant failed to brief his entitlement either to *Golding* review or to plain error review in his main brief"), cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007), overruled on other grounds by *State* v. *Payne*, 303 Conn. 538, 548, 34 A.3d 370 (2012); *Lebron* v. *Commissioner of Correction*, 274 Conn. 507, 532, 876 A.2d 1178 (2005) (stating that court will reach unpreserved constitutional claims if "party affirmatively requests and adequately briefs his entitlement to *Golding* review," and declining to reach constitutional claim as inadequately briefed where "the [defendant] ma[de] only a passing reference to *Golding* for the first time in his reply brief and fail[ed] to brief his entitlement to *Golding* review"); see also *Smith* v. *Andrews*, 289 Conn. 61, 80, 959 A.2d 597 (2008) (The court declined to engage in *Golding* review of unpreserved claims of improprieties by defense counsel during summation because "the plaintiff's brief is devoid of legal analysis regarding any of the *Golding* prongs or plain error review. In fact, the only discussion of *Golding* or plain error review in the plaintiff's brief consists of a lone citation, in a footnote, to *Golding* and to 'the plain error doctrine.' In addition, none of the cases that the plaintiff cites relate to either *Golding* review or plain error review." [Emphasis omitted.]). Numerous other decisions from this court after *Ramos* also failed to define the phrase "affirmative request"

and summarily declined to afford *Golding* review in the absence of some form of express request by the party seeking review.[14] See, e.g., *In re Jan Carlos D.*, 297 Conn. 16, 20 n.10, 997 A.2d 471 (2010); *Johnson* v. *Commissioner of Correction*, supra, 288 Conn. 60; *State* v. *Commins*, 276 Conn. 503, 515, 886 A.2d 824 (2005).

These decisions reciting the affirmative request requirement make clear the existence of a threshold briefing requirement to establish a party's entitlement to *Golding* review. Far less clear, however, is *why* we apparently imposed such a threshold requirement—in essence adding a fifth prong to *Golding*. The "affirmative request" requirement might well have been a result of a non sequitur in a single opinion, namely *Ramos*, taking on a jurisprudential life of its own. This conclusion is borne out by the fact that none of our decisions have ever explained the purpose of requiring a defendant seeking *Golding* review to brief both his underlying constitutional claim and the adequacy of his request for review of that claim.[15] This likely is because requiring parties to undertake an ill-defined, mechanistic layer of threshold briefing to demonstrate their entitlement to review of an unpreserved constitutional claims is fundamentally at odds with the policy goals of *Golding*, which is a judicially created rule of reviewability designed to balance the twin policy goals of vindicating constitutional rights while ensuring fairness to the parties and the courts alike by safeguarding against the tactical use of unpreserved claim on appeal. As we explained in *State* v. *Brunetti*, 279 Conn. 39, 55, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007), "*Golding* is a narrow exception to the general rule that an appellate court will not entertain a claim that has not been raised in the trial court. The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party. . . . Nevertheless, because constitutional claims implicate fundamental rights, it also would be unfair automatically and categorically to bar a defendant from raising a meritorious constitutional claim that warrants a new trial solely because the defendant failed to identify the violation at trial. *Golding* strikes an appropriate balance between these competing interests: the defendant may raise such a constitutional claim on appeal, and the appellate tribunal will review it, but only if the trial court record is adequate for appellate review." (Citation omitted.) In achieving this balance, *Golding* implicitly chooses among competing policy concerns; notice to the trial court and to the opposing party yields to the principle that colorable constitutional claims should receive review, the onus of establishing the factual and legal basis for such claims remaining, as it must, with the

defendant. See *State* v. *Golding*, supra, 213 Conn. 239–40.

In our view, Judges Bishop and Dupont, in their separate opinions in this case, best summarized why the additional briefing hurdle for an appellant imposed by the affirmative request requirement does nothing to enhance the notice concerns already addressed by the first two prongs of *Golding*, namely, "to prevent unfair surprise and to give the state the opportunity to fully respond to the defendant's claims." *State* v. *Elson*, supra, 125 Conn. App. 388 n.2 (*Bishop, J.*, concurring in part and dissenting in part); see id., 381 (*Dupont, J.*, concurring). Specifically, if a defendant's main brief properly identifies those portions of the record that form the factual basis for the unpreserved claim and a legal basis for the constitutional nature of that claim, then the opposing party and the reviewing court are more than able to respond to or address that claim as a matter of reviewability. If the defendant's brief fails to identify the relevant record sections, identify the governing constitutional principles, or apply law to fact in demonstrating the existence of a constitutional violation requiring reversal, then the claim likely will be deemed inadequately briefed and will fail on that ground anyway, regardless of some threshold invocation of *Golding* review prior to the briefing of the merits. See, e.g., *In re Melody L.*, supra, 290 Conn. 154; accord *State* v. *Golding*, supra, 213 Conn. 240–41 ("Patently nonconstitutional claims that are unpreserved at trial do not warrant special consideration simply because they bear a constitutional label. . . . For example, once identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed." [Citations omitted.]).

Further, requiring a defendant to acknowledge expressly that his claim is or may be unpreserved as a precondition to *Golding* review; see *State* v. *Elson*, supra, 125 Conn. App. 358–59; does not add anything to the reviewability calculus. The issue of preservation is often hotly contested. See, e.g., *State* v. *Dalzell*, 282 Conn. 709, 718–19, 924 A.2d 809 (2007). When the constitutional claim is one that is especially fact dependent, such as a suppression matter, the failure to preserve the claim before the trial court often results in an inadequate factual record for review, thus leading to the claim's failure on the merits.[16] See, e.g., id., 721–22 (under first prong of *Golding*, record inadequate to review unpreserved claim that traffic stop was unconstitutionally based on pretextual seat belt violation because of failure to raise issue, and obtain factual findings, at suppression hearing); *State* v. *Brunetti*, supra, 279 Conn. 63–64 (under first prong of *Golding*, record inadequate to review defendant's claim that consent of both present joint occupants is necessary for search because "the issue of the defendant's mother's consent was not before the court, the facts relevant to

the issue of the defendant's mother's consent never were adduced in the trial court"). If a reviewing court deems a claim of constitutional dimension to be unpreserved, declining to review that claim for failure of a defendant to either acknowledge that claim's unpreserved nature or incant the word *Golding* would represent a triumph of form over substance. Put differently, the affirmative request requirement, which has often caused appellants to adopt a belt and suspenders approach to the briefing of constitutional claims by arguing preservation *and* affirmatively claiming entitlement to *Golding* review as a safeguard, has served only to swell briefs with boilerplate and block quotes that are the understandable product of abundant caution by the appellants' counsel.[17]

Indeed, beyond expediting the writing of appellate opinions disposing of seemingly specious unpreserved claims on direct appeal, we agree with Judge Dupont that all articulating a fifth threshold prong of *Golding* accomplishes—particularly when the merits of the underlying claim have been briefed adequately to demonstrate reviewability and potential reversibility under the four prongs of *Golding*—is sowing grounds for "future habeas corpus petitions and other cases, both civil and criminal, that allege ineffective assistance of appellate counsel for failure to obtain appellate review of an unpreserved constitutional claim . . . ." *State* v. *Elson*, supra, 125 Conn. App. 387 (*Dupont, J.*, concurring). This, of course, serves no judicial economy, as the rapidly written appellate opinion of today is nothing more than kicking the can down the road to be addressed in the habeas petition of tomorrow—a counterproductive action that "actually increases the net workload of the judicial system." (Emphasis omitted.) *State* v. *Kitchens*, 299 Conn. 447, 524, 10 A.3d 942 (2011) (*Katz, J.*, concurring).

Finally, what is most troubling is that the affirmative request requirement has appeared to function as a "magic words" test—notwithstanding, as noted by the Appellate Court, this court's refusal in a variety of contexts "to attach talismanic significance to the presence or absence of particular words or phrases." (Internal quotation marks omitted.) *State* v. *Elson*, supra, 125 Conn. App. 353; see also, e.g., *State* v. *Robinson*, 227 Conn. 711, 731, 631 A.2d 288 (1993) ("[t]he fact that the trial court did not utter the talismanic words that the evidence was 'more probative than prejudicial' does not indicate that it did not make such a determination"). For example, in *Johnson* v. *Commissioner of Correction*, supra, 288 Conn. 60, this court declined *Golding* review for the sole reason that the defendant "failed to request that we undertake such review" or, more to the point, to say some magic word or phrase. Such a rigid approach is irreconcilable with the strong principles of public policy weighing in favor of reviewability that lie at the heart of *Golding*, and is entirely inconsistent with our body

of case law that values substance over matters of form.[18] See id., 68 (*Palmer, J.*, concurring) (addressing merits of constitutional claim, notwithstanding petitioner's failure to acknowledge its unpreserved nature or "invoke *Golding*," because "arguments and analysis that the [defendant] raised in support of his ex post facto claim are precisely the same arguments and analysis that he would have raised if he had invoked *Golding*").

In this case, the Appellate Court accurately interpreted our body of case law applying the "affirmative request" prerequisite to *Golding* review to require "nothing less than an explicit assertion and analysis in a party's main brief that explains that, if the reviewing court deems a particular claim to be unpreserved, that claim nonetheless is reviewable on appeal because the record is adequate to review the claim and it is a claim of constitutional magnitude." *State* v. *Elson*, supra, 125 Conn. App. 354–55. Nevertheless, we determine that the analysis of public policy and practical considerations underlying the affirmative request requirement set forth in *State* v. *Wright*, supra, 114 Conn. App. 463–64, although inconsistent with binding precedent from this court, is better reasoned. Accordingly, we overrule *State* v. *Ramos*, supra, 261 Conn. 171, and its progeny to the extent that those cases require a defendant to affirmatively request such review or impart a threshold level of analysis of entitlement to review under *Golding*.[19] We conclude, therefore, that to obtain review of an unpreserved claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, a defendant need only raise that claim in his main brief, wherein he must "present a record that is [adequate] for review and affirmatively [demonstrate] that his claim is indeed a violation of a fundamental constitutional right." (Internal quotation marks omitted.) *State* v. *Wright*, supra, 463. Accordingly, the defendant's failure in his main brief, as stated by the Appellate Court to (1) "identify or address any issues related to the reviewability of the claim," (2) "state that any extraordinary level of review is requested," (3) "refer to the *Golding* opinion either by name or in substance [or] address the issue of the adequacy of the record to review the claim," or (4) "present an analysis that, if the claim was not preserved, it nevertheless should be reviewed," did not preclude consideration of his federal constitutional claim, which otherwise was properly briefed, identified relevant constitutional authorities, and was founded on an adequate record for review. *State* v. *Elson*, supra, 125 Conn. App. 356; see also *State* v. *Wright*, supra, 463–64 (reviewing claim despite failure to mention *Golding* because "the defendant has provided a record adequate for review and has sufficiently demonstrated, by discussion of relevant authority, that his claim . . . implicates his sixth amendment right to confront witnesses and his fourteenth amendment due process right to obtain exculpa-

tory evidence").

## B

### Merits of the Defendant's Constitutional Claim

We now turn to a review of the defendant's constitutional claim under *Golding*. Relying heavily on Judge Bishop's concurring and dissenting opinion; see *State* v. *Elson*, supra, 125 Conn. App. 395–96; the defendant contends that application of the "totality of the circumstances" analysis articulated in *State* v. *Kelly*, supra, 256 Conn. 81–82, demonstrates that the trial court improperly punished him at sentencing for exercising his constitutional right to a jury trial. Although we conclude that the claim is reviewable under the first two prongs of *Golding*, we are guided by the totality of the circumstances analysis adopted in *Kelly*; see id., 82; and conclude that the defendant's claim fails under *Golding*'s third prong, which requires that he demonstrate that "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." *State* v. *Golding*, supra, 213 Conn. 240.

We note at the outset that this unpreserved claim is reviewable under the first two prongs of *State* v. *Golding*, supra, 213 Conn. 239, because: (1) the record is adequate for review as the trial court's remarks during sentencing are set forth in the transcripts in their entirety;[20] and (2) the claim is of constitutional magnitude, as demonstrated by the defendant's discussion of relevant authority in his main brief. See, e.g., *State* v. *Kelly*, supra, 256 Conn. 80–81 (discussing sixth amendment to United States Constitution and article first, § 8, of the Connecticut constitution). We now turn to the third prong of *Golding*, and determine whether "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." *State* v. *Golding*, supra, 240.

Our analysis under the third prong of *Golding* begins with *State* v. *Kelly*, supra, 256 Conn. 79–80, which is our leading decision[21] with respect to whether a trial court violates a defendant's "federal and state constitutional rights by improperly considering, at the sentencing phase of the proceedings, the defendant's decision to proceed to trial."[22] In *Kelly*, the defendant challenged the trial court's remark at "the conclusion of the defendant's sentencing hearing, and prior to imposing sentence . . . that '[t]he general factors which I have considered in this matter is whether or not there was a plea or a complete trial, and that is one of the legal factors to consider in sentencing.' "[23] Id., 80.

In resolving this claim we noted that, "[a]s a general matter, a trial court possesses, within statutorily prescribed limits, broad discretion in sentencing matters. On appeal, we will disturb a trial court's sentencing decision only if that discretion clearly has been abused. . . . *In spite of that discretion, however, the [a]ugmen-*

*tation of sentence based on a defendant's decision to stand on* [*his or her*] *right to put the* [*g*]*overnment to its proof rather than plead guilty is clearly improper.*" (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 80–81. Reviewing other federal and state courts' approaches to similar claims, we adopted what we deemed to be the majority view,[24] and concluded "that review of claims that a trial court lengthened a defendant's sentence as a punishment for exercising his or her constitutional right to a jury trial should be based on the totality of the circumstances. We further [held] that the burden of proof in such cases rests with the defendant." Id., 82. In so concluding, we rejected as a constitutional matter a minority view employing a " 'per se' rule requiring a remand for resentencing whenever a colorable claim is raised by a defendant that his sentence was lengthened because of his choice to stand trial."[25] Id.

Applying this majority view in *Kelly*, we determined that "[n]o fair reading of the record would permit the conclusion that the trial court's comment should be understood to mean that it was lengthening the defendant's sentence based on his choice to stand trial. Rather, we interpret[ed] the trial court's remark as a reminder to the defendant of the oft acknowledged truth that many factors favor relative leniency for those who acknowledge their guilt . . . and thus help conserve scarce judicial and prosecutorial resources for those cases that merit the scrutiny afforded by a trial. . . . *State* v. *Coleman*, 242 Conn. 523, 544, 700 A.2d 14 (1997). There is a world of difference between that reminder and a clear showing that the defendant received a lengthier sentence because he chose to exercise his right to a jury trial."[26] (Internal quotation marks omitted.) *State* v. *Kelly*, supra, 256 Conn. 84. We then concluded that the "totality of the circumstances surrounding the defendant's sentencing gave no indication that the trial court improperly augmented the defendant's sentence based on his decision to stand trial. As the trial judge [in *Kelly*] noted, he gave particular consideration to the age of the victim, the age of the defendant, the lack of closure of the matter for the eleven years preceding the second trial, the fact that the sentence was not influenced by other criminal matters pending against the defendant and, finally, proportionality." Id., 83; accord *State* v. *Fisher*, 121 Conn. App. 335, 350–52, 995 A.2d 105 (2010) (applying *Kelly* totality of circumstances analysis to claim that trial court improperly took defendant's silence into account, thereby penalizing him for exercise of fifth amendment rights, in dispositional phase of violation of probation proceeding).

Having reviewed the totality of the sentencing record in the present case, we conclude that the defendant has not carried his burden of proving that the trial court penalized him for exercising his constitutional right to

a jury trial. First, we note that the length of the sentence that the defendant received must be evaluated relative to the maximum sentence faced by the defendant and the sentence recommended by the state. In this case, the maximum sentence would have been thirty-five years imprisonment,[27] and the state recommended that the trial court sentence the defendant to thirty-five years imprisonment, suspended after twenty-five years, followed by five years probation with special conditions. See *State* v. *Elson*, supra, 125 Conn. App. 335. The trial court, however, did not follow that recommendation and, instead, sentenced the defendant to a total effective sentence of twenty-five years imprisonment, execution suspended after twenty years, followed by five years of probation with special conditions, fifteen years less than the defendant's maximum exposure, and five years less than what the state recommended. See id., 338. The trial court's decision to sentence the defendant to a term of imprisonment shorter than both the maximum sentence and what the state had recommended indicates that the trial court did not intend to penalize the defendant for exercising his right to a trial.

The lack of vindictiveness evinced in the length of the sentence is supported by the fact that the vast majority of the trial court's sentencing remarks reflected a detailed focus on "legitimate sentencing considerations," namely, victim impact evidence; see *State* v. *Coleman*, supra, 242 Conn. 546–47; and the defendant's demeanor, criminal history, presentence investigation report, prospect for rehabilitation and "general lack of remorse for the crimes" of which he has been convicted. *State* v. *Anderson*, 212 Conn. 31, 50, 561 A.2d 897 (1989); see also *State* v. *Eric M.*, 271 Conn. 641, 653–54, 858 A.2d 767 (2004); *State* v. *Barnes*, 33 Conn. App. 603, 610, 637 A.2d 398 (1994), aff'd, 232 Conn. 740, 657 A.2d 611 (1995). Indeed, it is significant that, when the trial court made the specific comments at issue, it did so in the context of discounting the mitigating factors, including the defendant's allocution, statements from a family friend and his father, and a letter from his mother, rather than in its separate recitation of factors that would justify lengthening the defendant's sentence, including the victim impact evidence, the severity of the defendant's attack on the victim, the randomness of the attack, the defendant's dangerousness as reflected by his pattern of violent behavior, which has been exacerbated by his substance abuse problems that have not been treated successfully, his incredible trial testimony, and the fact that he committed the crimes while on pretrial release for other pending felony charges. See *State* v. *Elson*, supra, 125 Conn. App. 337–38. Thus, the totality of the circumstances indicates that the trial court's actions were consistent with the maxim that, "[a]lthough a court may deny leniency to an accused who . . . elects to exercise a statutory or constitutional right, a court may not penalize an

accused for exercising such a right by increasing his or her sentence solely because of that election." *State v. Revelo*, 256 Conn. 494, 513, 775 A.2d 260, cert. denied, 534 U.S. 1052, 122 S. Ct. 639, 151 L. Ed. 2d 558 (2001). Accordingly, we conclude that the defendant has not carried his burden of proving, on the basis of the totality of the circumstances, that the trial court augmented his sentence in retaliation for the exercise of his right to stand trial.

## II

### SUPERVISORY AUTHORITY CLAIMS

We next turn to the dispositive supplemental issue, namely, whether we should use our supervisory authority to remand this case for a new sentencing proceeding. In his supplemental brief, the defendant claims that the exercise of our supervisory power, on a sua sponte basis, is appropriate because the state's appellate case law on this point is inconsistent and, therefore, "does not effectively put defendants and their counsel on notice as to what is required in this jurisdiction in order to properly preserve claims of sentencing impropriety . . . ." Relying on *State* v. *Coleman*, supra, 242 Conn. 523, and *State* v. *Rose*, 305 Conn. 594, 46 A.3d 146 (2012), the defendant further argues that the use of our supervisory powers is appropriate to ensure public confidence in the integrity and fairness of the judicial system, including with respect to sentencing matters. Thus, the defendant contends that we should "invoke [our] supervisory authority to warn the trial courts that their consideration of a defendant's election to proceed to trial, or other fundamental constitutional right, in sentencing the defendant shall not be tolerated, and more specifically, that the trial courts must not equate a defendant's exercise of his right to trial with a lack of remorse."

In response, the state contends that we should not exercise our supervisory authority because the defendant failed to request that relief properly in his main brief in the Appellate Court and the record is ambiguous and, therefore, inadequate with respect to whether the trial court actually lengthened the defendant's sentence because he had elected to stand trial. Citing *State* v. *Lockhart*, 298 Conn. 537, 577, 4 A.3d 1176 (2010), *State* v. *Andrews*, 248 Conn. 1, 20, 726 A.2d 104 (1999), and *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998), the state further emphasizes that we should invoke our supervisory powers only "rare[ly]" and " 'with great caution' " when "traditional protections are inadequate to ensure the fair and just administration of the courts." Positing that the trial court's comments were constitutionally indistinguishable from those determined not to require reversal in *State* v. *Kelly*, supra, 256 Conn. 79–84, the state further emphasizes that the exercise of our supervisory powers is inappropriate because there is no indication of a "judicial practice or tendency among sentencing courts to improperly comment upon and/or

penalize a defendant's exercise of his right to stand trial," either systemically or with regard to the trial judge in this case. In this vein, the state contends that existing doctrines of extraordinary review, such as *Golding* and plain error, provide sufficient protection to criminal defendants and that remanding the case for resentencing on this ambiguous record would contravene the usual presumption that the trial court acted correctly. See, e.g., *State* v. *Crumpton*, 202 Conn. 224, 231, 520 A.2d 226 (1987). We, however, agree with the defendant, and utilize our supervisory powers to emphasize that it would be inappropriate for a trial judge to consider, at sentencing, a defendant's decision to exercise his right to a trial, including with respect to an assessment of the defendant's remorse, given the negative impact such comments are likely to have on the public's perception of the criminal justice system. Accordingly, we remand this case to the trial court for a new sentencing proceeding.

### A

### Scope of This Court's Supervisory Powers

"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process." (Internal quotation marks omitted.) *State* v. *Rose*, supra, 305 Conn. 607. "Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. . . . The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Lockhart*, supra, 298 Conn. 576. Indeed, there is "no principle that would bar us from exercising our supervisory authority to craft a remedy that might extend beyond the constitutional minimum" because articulating a rule of policy and reversing a conviction under our supervisory powers "is perfectly in line with the general principle that this court 'ordinarily invoke[s] [its] supervisory powers to enunciate a rule that is not constitutionally required but that [it] think[s] is preferable as a matter of policy.' "[28] (Emphasis omitted.) *State* v. *Rose*, supra, 607–608, quoting *State* v. *Marquez*, 291 Conn. 122, 166, 967 A.2d 56, cert. denied,

558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

We begin with the state's arguments with respect to the propriety of the use of our supervisory powers in this case. The state contends that we should not use our supervisory powers to reach the defendant's unpreserved sentencing claim because he failed to request this type of review in his main brief before the Appellate Court, doing so only in his reply brief filed in that court. The state correctly observes that, to receive review, a claim must be raised and briefed adequately in a party's principal brief, and that the failure to do so constitutes the abandonment of the claim. See, e.g., *State* v. *Saucier*, 283 Conn. 207, 223, 926 A.2d 633 (2007); *State* v. *Garvin*, 242 Conn. 296, 312, 699 A.2d 921 (1997). The purpose of this rule is to provide the court with "the full benefit of . . . written argument" and to eliminate the unfair surprise to the appellee that would be created were an appellant to be permitted to raise a new claim on appeal in its reply brief. (Internal quotation marks omitted.) *State* v. *Garvin*, supra, 312. An appeals court may, however, raise the question of whether to use its supervisory powers sua sponte. See, e.g., *State* v. *Santiago*, 245 Conn. 301, 332 n.20, 715 A.2d 1 (1998). When an appellate court chooses to exercise this authority after oral argument, as we have in the present appeal, concerns regarding unfair surprise and inadequate argumentation can be alleviated by an order requiring the parties to file supplemental briefs. See, e.g., *State* v. *Rose*, supra, 305 Conn. 604–605 (sua sponte order requiring parties to brief supervisory powers issue after oral argument of appeal where certified question concerned applicability of constitutional harmless error analysis to defendant's compelled appearance in prison attire); accord *State* v. *Dalzell*, supra, 282 Conn. 715 ("[i]f the Appellate Court decides to address an issue not previously raised or briefed, it may do so only after requesting supplemental briefs from the parties or allowing argument regarding that issue"). Accordingly, we conclude that the defendant's failure to brief his supervisory authority claim properly in the Appellate Court does not preclude us from raising that issue sua sponte and deciding it subsequent to the receipt of supplemental briefing from the parties.

We next turn to the state's contention that existing constitutional, statutory and procedural rules, including bypass doctrines permitting the review of unpreserved claims such as *State* v. *Golding*, supra, 213 Conn. 239–40, and plain error,[29] are "generally adequate to protect the rights of the defendant and the integrity of the judicial system"; (internal quotation marks omitted) *State* v. *Lockhart*, supra, 298 Conn. 576; thus rendering it unnecessary and inappropriate to utilize our supervisory authority "for the sole purpose of vacating some portion or all of a criminal judgment merely to redress a perceived error in an individual case." See also *State* v. *Pouncey*, 241 Conn. 802, 813, 699 A.2d 901 (1997)

(noting that supervisory authority "is not a form of free-floating justice, untethered to legal principle" [internal quotation marks omitted]). We agree with the state that the supervisory authority of this state's appellate courts is not intended to serve as a bypass to the bypass, permitting the review of unpreserved claims of case specific error—constitutional or not—that are not otherwise amenable to relief under *Golding* or the plain error doctrine. "Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 439, 773 A.2d 287 (2001). Thus, a defendant seeking review of an unpreserved claim under our supervisory authority must demonstrate that his claim is one that, as a matter of policy, is relevant to "the perceived fairness of the judicial system as a whole," most typically in that it lends itself to the adoption of a procedural rule that will "guide the lower courts in the administration of justice in all aspects of the criminal process."[30] (Internal quotation marks omitted.) *State* v. *Rose*, supra, 305 Conn. 607; see also *State* v. *Anderson*, supra, 255 Conn. 441 (Where the trial court had conducted the proper preliminary inquiry under *State* v. *Brown*, 235 Conn. 502, 528, 668 A.2d 1288 [1995], "the use of [this court's] supervisory authority [to order a new trial] would be inappropriate . . . because it would not have sufficient boundaries to guide future trial courts. Rather, it would more likely create confusion as to the proper procedures to follow in jury misconduct cases."). In our view, adherence to this unifying principle mitigates against the specter of arbitrary, result oriented, and undisciplined jurisprudence that may be a potential risk of the expansive use of our supervisory powers. Thus, we turn to the merits of the defendant's claims to determine whether they implicate the perceived fairness of the system as a whole.[31]

B

This Court's Supervisory Powers in the Sentencing Context

1

Background

We have previously utilized our supervisory powers to craft procedural rules that protect against the appearance of a judge penalizing a defendant for the exercise of his constitutional rights because "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort . . . ." (Citation omitted.) *Bordenkircher* v. *Hayes*, 434 U.S. 357, 363, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978). Most notably, in *State* v. *Coleman*, supra, 242 Conn. 541, we refrained from determining, "for state constitutional purposes, as to whether a presumption of vindictiveness attaches where a defendant previously

has been sentenced under the terms of a plea agreement and, having successfully challenged his conviction, receives a greater sentence following a trial,"[32] but nevertheless utilized our supervisory powers to conclude that "such a defendant should be afforded an explanation, if one is requested, justifying the enhanced sentence."[33] In utilizing our supervisory powers, we emphasized that "[a]n important function of this court is to ensure public confidence in the integrity of the judicial system. This confidence is enhanced through the enactment of rules that safeguard the fairness of our system of justice. A requirement that the trial court articulate the objective criteria upon which it relied in imposing a greater sentence will promote public confidence in the fair and impartial administration of justice by dispelling concerns that the subsequent sentence was the product of prosecutorial or judicial vindictiveness." Id.

In *Coleman*, we determined that our use of supervisory powers to adopt this rule "dispels these concerns in two important respects. First, it aids in the eliminat[ion of] even the possibility of retaliation so that the defendant will have no apprehension about exercising the right of appeal. . . . Second, because it is [usually] exceedingly difficult to establish that a judge has retaliated against a defendant for exercising legal rights . . . the rule ensures that there will be an adequate record for appellate review of a defendant's claim of retaliation."[34] (Citations omitted; internal quotation marks omitted.) Id., 541–42.

Similarly, in *State* v. *Revelo*, supra, 256 Conn. 503 and n.19, we deemed the presence or appearance of vindictiveness in sentencing to be a matter sufficiently important to justify the use of our supervisory power to reach an issue that was not preserved and, indeed, might well have been waived by the trial court's canvass informing the defendant that his appellate rights were limited under General Statutes § 54-94a[35] to the substantive issues raised in his motion to suppress. In *Revelo*, we noted that the defendant's "due process claim gives rise to an important issue, namely, the proper role of our trial judges in the plea bargaining process, the significance of which transcends this particular case." Id., 503. Citing *Bordenkircher* v. *Hayes*, supra, 434 U.S. 363, in support of the proposition that "principles of due process prohibit a court from retaliating against a defendant merely for exercising a statutory or constitutional right," we then concluded that the trial court[36] had violated the defendant's due process rights by telling him that "he would be required to serve one extra year in prison if he agreed to plead guilty only after exercising his right to a judicial determination of his motion to suppress." *State* v. *Revelo*, supra, 513; see also id., 514 (finding "no difficulty" in discerning from record that "trial court imposed a more severe sentence on the defendant solely because he asserted his right to a judi-

cial ruling on his motion to suppress"). We emphasized that, to avoid the perception of vindictiveness in sentencing, "it also would be incumbent upon the court to explain why a greater sentence might be appropriate . . . to dispel any suggestion that the court was prepared to punish the defendant merely for exercising his right to a judicial determination of his motion." (Citation omitted.) Id., 516.

2

Trial Courts' Commentary during Sentencing

In our view, concerns about the appearance of vindictiveness in sentencing expressed in *Coleman* and *Revelo* are not assuaged by the oft-repeated, but difficult to implement, "fine distinction" noted therein between extending lenience to those who plead guilty and penalizing those who exercise their rights to a trial.[37] See, e.g., *State* v. *Revelo*, supra, 256 Conn. 513–14; *State* v. *Kelly*, supra, 256 Conn. 84; *State* v. *Coleman*, supra, 242 Conn. 544. Thus, we find persuasive Judge Bishop's comprehensive dissenting opinion, which utilizes the appellate courts' supervisory power to reach the defendant's unpreserved claims. *State* v. *Elson*, supra, 125 Conn. App. 388–89. In particular, we agree with Judge Bishop that, given our state's extremely heavy reliance on plea bargaining in resolving criminal cases;[38] see, e.g., *State* v. *D'Antonio*, 274 Conn. 658, 679–80 n.12, 877 A.2d 696 (2005); we "must be particularly vigilant in circumstances in which the right [to a jury trial] may be in peril. One such circumstance may arise at sentencing. One court has commented, 'courts must not use the sentencing power as a carrot and stick to clear congested calendars, and they must not create an appearance of such a practice.' *United States* v. *Stockwell*, 472 F.2d 1186, 1187 (9th Cir.), cert. denied, 411 U.S. 948, 93 S. Ct. 1924, 36 L. Ed. 2d 409 (1973)." *State* v. *Elson*, supra, 125 Conn. App. 393. Thus, we too observe that, "[w]here disposition by trial is relatively rare, it is even more important to public confidence in our judicial system, if not to due process itself, that the court not take into consideration at sentencing the rare exercise of the right of the defendant to require the state to prove its case at trial." Id., 393 n.7 (*Bishop*, *J.*, concurring and dissenting). Accordingly, we conclude, pursuant to our supervisory authority, that a trial judge should not comment negatively on the defendant's decision to elect a trial during sentencing, given the appearance of impropriety of that consideration.[39]

Further, our conclusion, pursuant to our supervisory authority, at sentencing, that trial judges should not comment negatively on a defendant's election of a trial supplements the constitutional analysis in *State* v. *Kelly*, supra, 256 Conn. 81, wherein this court emphasized that the "[a]ugmentation of sentence based on a defendant's decision to stand on [his or her] right to put the [g]overnment to its proof rather than plead guilty is clearly

improper." (Internal quotation marks omitted.) As noted previously,[40] in *Kelly*, we adopted what we deemed to be the majority approach, and concluded "that review of claims that a trial court lengthened a defendant's sentence as a punishment for exercising his or her constitutional right to a jury trial should be based on the totality of the circumstances. We further [held] that the burden of proof in such cases rests with the defendant." Id., 82. In so concluding, we rejected as a constitutional matter a minority view employing a " 'per se' rule requiring a remand for resentencing whenever a colorable claim is raised by a defendant that his sentence was lengthened because of his choice to stand trial." Id. Our conclusion in this case, made pursuant to our supervisory powers, supplements the constitutional rule identified in *Kelly* because, although the totality of the circumstances analysis adopted therein is appropriate for constitutional due process purposes to determine whether the violation of a non-structural rule amounts to harmful error requiring the remedy of reversal,[41] it does not provide trial judges with the clear guidance that typically accompanies the exercise of our supervisory authority. See *State* v. *Rose*, supra, 305 Conn. 605–606 (utilizing supervisory power to adopt rule "that the conviction of a defendant who is compelled to stand trial in identifiable prison clothing in violation of his or her constitutional rights is reversible per se"). Moreover, and as Judge Bishop noted, except in the "most blatant" cases, it is difficult to ascertain meaningfully from the record whether a trial judge has actually held a defendant's election of a trial against him. *State* v. *Elson*, supra, 125 Conn. App. 392 n.6; see also, e.g., *United States* v. *Perez*, 904 F.2d 142, 146 (2d Cir. 1990) ("this court recognizes . . . that it is not always easy to demonstrate actual vindictiveness" [citation omitted]). This is particularly so, given the "fine line between considering a defendant's lack of remorse and penalizing a defendant for refusing to plead guilty and insisting on his right to trial"; *State* v. *Knight*, 701 N.W.2d 83, 87 (Iowa 2005); see also footnote 37 of this opinion and accompanying text; and the fact that Connecticut lacks sentencing guidelines that might create norms from which otherwise unexplained deviations could be objective evidence of retaliation. See *State* v. *Elson*, supra, 125 Conn. App. 392 n.5 (*Bishop*, *J.*, concurring and dissenting). That such comments are, therefore, not truly amenable to a traditional constitutional harmless error analysis is a factor that is a "core [consideration] . . . identified as [a prerequisite] to the invocation of our supervisory authority." *State* v. *Rose*, supra, 608; see also id., 614 (noting that "unlike most other constitutional errors, compelling a defendant to stand trial in identifiable prison clothing is not just highly demeaning but also potentially highly prejudicial in a manner the effects of which may be very difficult to measure because they involve a subtle but ever present cognitive bias"); id., 614 n.20 (stating that

"ill effects of a defendant's compelled appearance in prison clothing being very difficult to measure, we are loath to engage in . . . harmless error analysis").

### 3
### Application to the Merits of This Case

Relying on Judge Robinson's concurrence in this case, the state contends, however, that the record is ambiguous with respect to whether the trial court actually lengthened the defendant's sentence as a result of his election of a trial, and that this ambiguity renders it inadequate for review. See *State* v. *Elson*, supra, 125 Conn. App. 375–77. We disagree. The record in this case is perfectly adequate for review in that the transcript of the sentencing proceeding tells us verbatim what happened in the trial court; the only question or ambiguity remaining concerns the possible inferences to be drawn from the trial court's comments therein.[42] Put differently, finding this particular record inadequate for review of this claim would mean that, absent the extremely unlikely admission by a trial judge that he or she is lengthening a defendant's sentence as a result of the trial election,[43] no record would ever be adequate for review of a claim like this without the aid of a crystal ball or mind reader.

Moreover, Judge Robinson's observations with respect to the content of the record in this case capture the very need for the exercise of our supervisory authority in this context. He aptly observed that "reasonable minds can disagree as to whether the court's statement concerning the defendant's remorse actually was factored into the court's sentence." Id., 377. The apparent ambiguity in the trial court's remarks with respect to the court's intent to penalize the defendant for exercising his right to a trial, and the disparate inferences that could be drawn therefrom, lend support to the exercise of our supervisory authority in order to prevent the *appearance* of improper action that reflects poorly on the "perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Rose*, supra, 305 Conn. 607; see also *State* v. *Pena*, 301 Conn. 669, 684, 22 A.3d 611 (2011) ("we suggest that our trial courts in future sentencings refrain from expressing disagreement with the jury's verdict" because doing so "may undermine public confidence in the jury system"); cf. *State* v. *D'Antonio*, supra, 274 Conn. 693 n.22 (due process requires "that a defendant receive a trial before a court who, at the very least, appears free of bias"); *Cameron* v. *Cameron*, 187 Conn. 163, 170, 444 A.2d 915 (1982) ("[t]he appearance as well as the actuality of impartiality on the part of the trier is an essential ingredient of a fair trial").

Finally, we do not in any way intimate that trial courts are precluded from considering or discussing at sentencing the defendant's *conduct* during the trial and

sentencing proceedings, including the apparent veracity of the defendant's testimony therein. Beyond forgoing the potential and permissible exercise of leniency in exchange for a guilty plea, a defendant who elects a trial generally incurs greater exposure at sentencing because "the relevant sentencing information available to the judge after the plea will usually be considerably less than that available after a trial." *Alabama* v. *Smith*, 490 U.S. 794, 801, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989); accord *State* v. *Coleman*, supra, 242 Conn. 543–44. The defendant's demeanor, criminal history, presentence investigation report, prospect for rehabilitation and "general lack of remorse for the crimes" of which he has been convicted remain "legitimate sentencing considerations."[44] *State* v. *Anderson*, supra, 212 Conn. 50; see also *State* v. *Eric M.*, supra, 271 Conn. 653–54 (same); *State* v. *Barnes*, supra, 33 Conn. App. 610 ("a continued protestation of innocence and lack of remorse indicate to the sentencing judge the individual's prospect for rehabilitation"). To this end, the Iowa Supreme Court has emphasized that a sentencing court is "not preclude[d] . . . from finding a lack of remorse based on facts other than the defendant's failure to plead guilty," but "must carefully avoid any suggestions in its comments at the sentencing stage that it was taking into account the fact [the] defendant had not pleaded guilty but had put the prosecution to its proof." (Internal quotation marks omitted.) *State* v. *Knight*, supra, 701 N.W.2d 87; see also *Jennings* v. *State*, 339 Md. 675, 688, 664 A.2d 903 (1995) ("[A] sentencing court may consider, on the issue of a defendant's prospects for rehabilitation, the defendant's lack of remorse. The record in this case does not indicate that the trial court was considering the defendant's refusal to plead guilty. Instead, it was the [defendant's] present tense refusal to accept responsibility, or show remorse, for his actions on which the court focused."); *State* v. *Shreves*, 313 Mont. 252, 260, 60 P.3d 991 (2002) ("[W]e cannot uphold a sentence that is based on a refusal to admit guilt. To do so would reflect an inquisitorial system of justice rather than our adversarial system."); *State* v. *Burgess*, 156 N.H. 746, 760, 943 A.2d 727 (2008) (the court held "that a sentencing court may not draw a negative inference of lack of remorse from a defendant's silence at sentencing," but emphasized that "this holding does not preclude a court from considering other evidence besides a defendant's silence that indicates a defendant's lack of remorse. . . . Nor does it prevent a trial court from considering a defendant's false trial testimony as a sentencing factor." [Citation omitted.]).

We conclude, therefore, that the trial court's remarks, which created an appearance of impropriety insofar as they referred adversely to the defendant's election of a trial in evaluating the defendant's remorse and addressing the effect of the offense and trial on the victim,[45] warrant the invocation of our supervisory

authority to grant the defendant a new sentencing proceeding. An observer hearing the comments at issue in this case could have perceived that the trial court "equated the defendant's exercise of the right to trial with the absence of remorse"; *State* v. *Elson*, supra, 125 Conn. App. 395 (*Bishop*, *J.*, concurring and dissenting); thereby tainting the public's perception of the sentencing decision in this case. This is particularly so when the specific comment, namely, that, "[*i*]*f the defendant had been truly apologetic, he wouldn't have put the victim through the trial*," is viewed in the context of the trial court's subsequent remark apparently discounting the defendant's decision to plead guilty to the bail status offense under § 53a-40b (1), by noting that it "would have been a simple trial and the violation was obvious, *so the admission really did not save the state any resources*." (Emphasis added.) Although these remarks, when viewed in the totality of the circumstances surrounding the rest of the defendant's sentencing, cannot be understood as violating the defendant's due process rights by penalizing him for exercising his right to a trial; see part I B of this opinion; they nevertheless, viewed together, create the perception—*if not the actuality*—that the trial court, in crafting the sentence, improperly took into account the defendant's exercise of his rights, which the court viewed as an unnecessary imposition on the system and the victim. Accordingly, given the adverse effects such commentary may have on the public's perception of the inherent fairness of the criminal justice system, we conclude that a new sentencing proceeding is required.[46]

The judgment of the Appellate Court with respect to the defendant's sentencing is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court in part and to remand the case to the trial court for a new sentencing proceeding.

In this opinion the other justices concurred.

* This case originally was argued before a panel of this court consisting of Chief Justice Rogers and Justices Norcott, Palmer, Zarella and Eveleigh. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Justices McDonald and Espinosa were added to the panel, and they have read the record and briefs and listened to a recording of the oral argument prior to participating in this decision.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] We granted the defendant's petition for certification limited to the following issue: "Did the Appellate Court properly conclude that the defendant's claims were not reviewable under *State* v. *Golding*, [supra, 213 Conn. 233]?" *State* v. *Elson*, 300 Conn. 904, 12 A.3d 572 (2011).

[2] General Statutes § 53a-40b was amended by No. 10-36, § 21, of the 2010 Public Acts, which made certain changes to the statute that are not relevant to the present appeal. For purposes of clarity, we refer to the current revision of the statute.

[3] For a more detailed recitation of the underlying facts of this case, see *State* v. *Elson*, supra, 125 Conn. App. 331–34.

[4] The jury found the defendant not guilty on the charge of attempt to commit assault in the first degree.

[5] In her impact statement, the victim stated that: "On September 3, 2004, the defendant changed my life forever. At the time, I was a newlywed,

married just two months, working on completing my degree at Western Connecticut State University.

"As I worked on a drawing in White Hall, [the defendant] brutally attacked me with a knife. . . . As I put up my hands to protect my face he slashed me with the knife. I don't know how I found the strength to fight him off, especially given the pain I was in and the blood covering me, but somehow I escaped and ran to campus police for assistance. I was in such shock that I refused to stop running, despite offers of help from other students. I felt that if I could reach a police officer I would be safe. I cannot stop thinking about what would have happened if I did not manage to escape, most likely I would not be here today.

"After the attack my family and I lived in fear that the defendant would not be found and I would live my life afraid that he would return and . . . continue to attack or kill other victims. My husband and other family members and friends stayed with me at all times so I would not be alone. He was apprehended, but I am so fearful.

"I underwent surgery for my hand and had several months of therapy. I have visible scars on my face and body that will never go away.

"Beyond the physical injuries I've suffered, this crime has had a tremendous impact on my life emotionally. Before this happened, I was open and trusting. Now I am guarded and cautious, always fearing that this could happen to me again.

"I am now the mother of a four month old—in fact, I testified at the trial when my baby was only four weeks old. During the trial, it was awful for me to relive the brutal attack and for my husband, parents, friends, and the many other family members to hear firsthand the events of that day.

"The fact that the defendant denied he had the capacity to commit this crime is shocking and shows me that he has not taken responsibility for what he has done to me. In my opinion, anyone capable of such a brutal and unprovoked attack will strike again.

"It is my sincere hope that the court recognizes the viciousness of the crime and the apparent lack of remorse by the defendant and sentences him to an appropriate punishment. Please protect me and other innocent victims from further attacks. Thank you."

[6] The trial court qualified that observation, however, noting that the bail status charge "would have been a simple trial and the violation was obvious, so the admission really did not save the state any resources."

[7] The defendant also claimed that: "(1) with regard to his assault conviction, the court improperly permitted the jury to find that his hands were dangerous instruments, (2) the court improperly admitted certain evidence, (3) the court, in its jury charge, improperly commented on his interest in the outcome of the case, improperly commented on the state's interest in protecting innocent persons from being convicted of crimes and delivered an instruction on reasonable doubt that diluted the state's burden of proof, [and] (4) the evidence did not support the jury's verdict with regard to the assault charge . . . ." *State* v. *Elson*, 116 Conn. App. 196, 199, 975 A.2d 678 (2009). The Appellate Court rejected these claims, and they are not at issue in this certified appeal. See id.; see also *State* v. *Elson*, supra, 125 Conn. App. 331.

[8] We note that the defendant does not contend in this certified appeal that the trial court improperly considered the knife at sentencing and, thus, limits his challenge to the trial court's comments regarding his decision to stand trial.

[9] The Appellate Court's dictum relying on *State* v. *Kelly*, supra, 256 Conn. 79–84, was a response to a dissenting opinion issued by Judge Bishop. *State* v. *Elson*, supra, 125 Conn. App. 365–66 and 366–67 n.15. The Appellate Court determined that "the interests of justice do not require that we exercise our supervisory powers to grant the defendant relief"; id., 361; because "[t]he record in the present case is inherently ambiguous with regard to whether the court, in fact, augmented the defendant's sentence because he elected to stand trial," and "[o]n appeal, the rulings of the trial court are entitled to a presumption of correctness; a reviewing court does not presume error on the basis of an incomplete or ambiguous record." Id., 365.

[10] With respect to these separate opinions, we note that Judge Bishop, joined by Judge Lavine, agreed with the majority's decision to overrule *Wright*, but concluded that, although the defendant had not adequately requested *Golding* review of his unpreserved constitutional claim, he would reach that "issue by invoking our supervisory power over the administration of justice in resolving the present appeal." *State* v. *Elson*, supra, 125 Conn. App. 388–89. After reviewing the record, Judge Bishop then concluded that

the case should be remanded for resentencing because the trial court's remarks were distinguishable from those deemed not reversible in *State* v. *Kelly*, supra, 256 Conn. 79–84, and had violated the defendant's due process rights. See *State* v. *Elson*, supra, 125 Conn. App. 395–96, 398–99.

Judge Robinson concurred with the judgment of the Appellate Court, including the majority's decision not to utilize its supervisory powers to reach the defendant's claims, but wrote "separately to emphasize the point that a trial court should never take into consideration whether a person exercised his or her constitutional right to trial by jury and also to dispel any suggestion that this court's decision represents tacit approval for such a practice." Id., 369.

Judge Dupont again concurred in the result separately, concluding that the defendant's unpreserved constitutional claim was raised adequately under *State* v. *Wright*, supra, 114 Conn. App. 463, which she would not overrule, but also concluding that the defendant had failed to prove that the trial court violated his due process rights at sentencing. See *State* v. *Elson*, supra, 125 Conn. App. 386–87.

[11] Accordingly, we leave for another day the first question raised by way of our supplemental briefing order, namely, whether "the doctrine of *State* v. *Golding*, [supra, 213 Conn. 233], [should] apply to an unpreserved claim that a trial judge commented improperly during sentencing on the defendant's exercise of his constitutional right to a jury trial?"

[12] As the state points out, we acknowledge that the defendant does not expressly request the overruling or abolition of the affirmative request requirement. Nevertheless, given the significant inconsistency between the analysis in *State* v. *Wright*, supra, 114 Conn. App. 463–64, and our post-*Ramos* case law, we view the defendant's extensive arguments in support of the *Wright* standard as seeking, de facto, the overruling of the affirmative request requirement. Thus, for the purpose of providing clear guidance to litigants and the lower courts in this important area of appellate procedure, we do not intimate that our adoption of the *Wright* analysis urged by the defendant is anything less than complete abandonment of the affirmative request rule. Further, the state's brief, which focuses primarily on the consistency of the affirmative request rule as interpreted by the Appellate Court in this case with existing principles of appellate review, and the inconsistency of *Wright* as a corollary, essentially mirrors the stare decisis considerations in support of rejecting *Wright*—meaning that the state has not been prejudiced by not having the opportunity to brief a specific claim objecting to the elimination of the affirmative request rule.

[13] In determining that *Golding* review was appropriate in *Waz*, this court cited by analogy to *State* v. *Roy*, 233 Conn. 211, 212, 658 A.2d 566 (1995) (per curiam), wherein the "state [had] conceded that such review is appropriate, despite the defendant's failure to invoke the guidelines set forth in *State* v. *Golding*, [supra, 213 Conn. 239–40], for review of his unpreserved claim of constitutional error." See *State* v. *Waz*, supra, 240 Conn. 371 n.11. We note that, in its en banc opinion in this case, the Appellate Court distinguished *Roy* on the ground that it involved a challenge to the sufficiency of the evidence and, therefore, belonged in a category that this court has specifically "disconnected" from the need to brief entitlement to *Golding* review on the ground that a defendant convicted based on insufficient evidence " 'would therefore necessarily meet the four prongs of *Golding*.' " *State* v. *Elson*, supra, 125 Conn. App. 350, quoting *State* v. *Adams*, 225 Conn. 270, 276 n.3, 623 A.2d 42 (1993).

We acknowledge that *Roy* appears to have sowed some confusion about whether its principle of permitting review under the principles of *State* v. *Golding*, supra, 213 Conn. 239–40, despite the defendant's failure to invoke that decision, "applies to all alleged constitutional deprivations or only those that relate to a claim that the evidence was insufficient to convince a trier that every element of an offense has been proven beyond a reasonable doubt." *State* v. *Rogers*, 38 Conn. App. 777, 788 n.10, 664 A.2d 291, cert. denied, 235 Conn. 918, 665 A.2d 610 (1995), cert. denied, 516 U.S. 1084, 116 S. Ct. 799, 133 L. Ed. 2d 747 (1996). The Appellate Court "interpret[ed] the words '[i]n the circumstances of this case' to refer to unpreserved sufficiency claims and not to the particular factual situation presented in *Roy*." Id.; see *State* v. *Thomas*, 62 Conn. App. 356, 361 n.6, 772 A.2d 611 (same), cert. denied, 256 Conn. 912, 772 A.2d 1125 (2001); see also *State* v. *Wright*, supra, 114 Conn. App. 462–63 (citing *Roy* and *Waz* in support of proposition that, "in a number of instances, both [our Appellate Court] and our Supreme Court have reviewed an unpreserved alleged constitutional claim despite the defendant's failure to request a *Golding* review"); *State* v. *Liebowitz*,

65 Conn. App. 788, 805 n.7, 783 A.2d 1108 (citing *Roy* in rejecting the state's claim "that *Golding* review is inappropriate because the defendant, in his brief, summarily states that his confrontation clause rights were violated without any citation to authority or analysis" stating that "[a]lthough the defendant did not provide this court with an overwhelming analysis of his claim, neither an inadequate briefing of a constitutional issue nor a failure to invoke the word 'Golding' prevents us from reviewing the claim"), cert. denied, 259 Conn. 901, 789 A.2d 992 (2001).

[14] Other decisions of this court affording *Golding* review after *Ramos* acknowledged the affirmative request requirement without explicating in detail how the party requesting review complied. See *State* v. *Cutler*, 293 Conn. 303, 324–25, 977 A.2d 209 (2009); *State* v. *Bowman*, 289 Conn. 809, 815, 960 A.2d 1027 (2008); *State* v. *Reid*, 277 Conn. 764, 781, 894 A.2d 963 (2006); see also *State* v. *Cameron M.*, 307 Conn. 504, 530 n.23, 55 A.3d 272 (2012) (noting state's claim to contrary, and "assum[ing], without deciding, that the defendant's brief adequately makes an 'affirmative request' for *Golding* review of his unpreserved constitutional claim"), cert. denied, U.S. , 133 S. Ct. 2744, 186 L. Ed. 2d 194 (2013).

[15] The closest we came to an explanation was a rather circular and perfunctory citation to *Ghant* v. *Commissioner of Correction*, supra, 255 Conn. 17, for the proposition that "[i]t is not appropriate to engage in a level of review that is not requested." (Internal quotation marks omitted.) See, e.g., *In re Melody L.*, supra, 290 Conn. 154; *State* v. *Ramos*, supra, 261 Conn. 171–72.

[16] Thus, we disagree with the state's contention that not requiring a defendant to acknowledge explicitly the unpreserved nature of his claim "removes any meaningful consequence of not contemporaneously objecting to a perceived error at trial." A defendant who fails to object to a perceived error at trial faces numerous "meaningful consequence[s]" with respect to the odds of his success on appeal, including raising risks that: (1) he may fail to establish a record adequate for appellate review, thus leading to a loss under the first prong of *Golding*; (2) his claim may not be deemed constitutional in nature, thus leading to a loss under the second prong of *Golding*; or (3) his or counsel's inaction may be construed as a waiver of his rights; see, e.g., *State* v. *Kitchens*, 299 Conn. 447, 467–68, 10 A.3d 942 (2011); thus leading to a loss under the third prong of *Golding*. Moreover, statistical analysis demonstrates that removing this artificial and contrived barrier to the availability of *Golding* review will not hand defendants the keys to the jailhouse door, even in jury instruction cases where the record is, by definition, adequate for review. See id., 522 and n.17 (*Katz, J.*, concurring) (explaining and detailing "statistics showing that reviewing courts rarely conclude that the defendant can prevail on a *Golding* challenge to an improper jury instruction").

[17] Moreover, because this court may, on occasion, exercise its supervisory authority to consider a claim "that has not been raised appropriately under . . . *Golding*"; *State* v. *Ramos*, supra, 261 Conn. 172 n.16; even the most stringent affirmative request requirement did not generally relieve the prudent appellate prosecutor from responding to the merits of unpreserved constitutional claims.

[18] We disagree with the state's argument that the approach to the affirmative request requirement adopted by the en banc Appellate Court in the present case has the salutary effect of being consistent with this court's approach "in cases in which a party seeks review of a state constitutional claim" under *State* v. *Geisler*, supra, 222 Conn. 684–85. As our recent state constitutional case law makes clear, our "functional," rather than formulaic, approach to *Geisler* leads to the review of adequately briefed state constitutional claims despite technical lapses in the application of that decision's six factor approach to the analysis of such claims. See *State* v. *Santiago*, 305 Conn. 101, 250–51, 49 A.3d 566 (2012) (reviewing defendant's state constitutional claim that it violates Connecticut constitution for pecuniary gain aggravating factor to duplicate element of capital felony by murder for hire, despite his failure to cite *Geisler* "or outline his state constitutional analysis seeking greater protection using that decision's well-known factors," because "his brief functionally addresses in detail the subject matter of most of the factors, which *Geisler* and other cases indicate are appropriate for an independent state constitutional analysis").

[19] In overruling this body of case law, "we are mindful that [t]his court [often] has . . . acknowledged the significance of stare decisis to our system of jurisprudence because it gives stability and continuity to our case law. . . . The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable

logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . Nevertheless, [s]tare decisis in not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision. . . . Consequently, [n]one of the foregoing [considerations] . . . necessarily constitutes an insurmountable barrier to a court's reconsideration of its prior precedent. With respect to the doctrine of stare decisis, we repeatedly have observed that [t]he value of adhering to [past] precedent is not an end in and of itself . . . if the precedent reflects substantive injustice. [Because] [c]onsistency must also serve a justice related end . . . [c]onsistency obtains its value best when it promotes a just decision. . . . [E]xperience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better. . . . Indeed, [i]f law is to have current relevance, courts must have and exert the capacity to change a rule of law when reason so requires. . . . [Thus] [t]his court . . . has recognized many times that there are exceptions to the rule of stare decisis. . . . In accordance with these principles, we have not hesitated to revisit and overrule our prior holdings, including prior holdings applicable to criminal matters . . . once we are convinced that they were incorrect and unjust." (Citations omitted; internal quotation marks omitted.) *State* v. *Moulton*, 310 Conn. 337, 362–63 n.23, 78 A.3d 55 (2013).

[20] For additional discussion of the adequacy of the record for review, including the state's claims to the contrary, see footnote 42 of this opinion and accompanying text.

[21] But see *State* v. *Rice*, 172 Conn. 94, 103, 374 A.2d 128 (1976) (rejecting similar claim with no analysis beyond observation that "[a]n essential ingredient in any plea bargaining situation is the recognition by both the prosecution and the defense that a trial may produce a less favorable result for the defendant").

[22] In distinguishing *State* v. *Kelly*, supra, 256 Conn. 23, from the present case, Judge Bishop described the claim presented and decided in *Kelly* as "focus[ing] . . . on whether the court lengthened a defendant's sentence as punishment for exercising the right to trial," rather than "on whether the court impermissibly took the defendant's [decision to] exercise [that right] into consideration at sentencing." *State* v. *Elson*, supra, 125 Conn. App. 395 n.8. The defendant echoes this analysis, and contends that his constitutional claim in this case is focused on the impropriety of the trial court's *consideration* of his trial election, rather than the impropriety of the *elongation* of his sentence as a consequence of that consideration. We disagree with this assessment of the claims raised and decided in *Kelly*. Rather, we agree with the Appellate Court majority's view of the claims described in *Kelly*, namely, that the issue therein was framed based on the trial court's consideration of the defendant's exercise of his right to trial, rather than founded "solely upon a theory of sentence augmentation . . . ." Id., 367 n.15. As noted by the Appellate Court majority, we stated in *Kelly* the impropriety of the action of *considering*, at sentencing, a defendant's decision to elect a trial; see *State* v. *Kelly*, supra, 79–80; but required the defendant to prove sentence augmentation to establish a "clear showing" of a due process violation. Id., 84.

In any event, the distinction between consideration and augmentation is, for the practical purpose of establishing a constitutional violation requiring reversal, is one that lacks a meaningful difference. Under *Kelly*, consideration and augmentation are inseparable with respect to establishing the existence of a constitutional violation requiring reversal; augmentation is necessary to establish the requisite harm. Put differently, our adoption of a totality of the circumstances analysis in *Kelly* indicates a rejection of an approach deeming consideration of the defendant's trial election to be, in essence, structural constitutional error requiring per se reversal.

[23] We noted in *Kelly* that the trial "court's complete statement regarding the factors that it had taken into account in sentencing the defendant was as follows: '*The general factors which I have considered in this matter is whether or not there was a plea or a complete trial, and that is one of the legal factors to consider in sentencing.* Whether the motive accomplished— of accomplishing the act was either need—was need or greed, the defendant's degree of involvement, the violence and/or its potential for violence, physical injury to the victim, the mental injury to the victim, the relationship between the [d]efendant and the victim, the degree of planning, and the statutory seriousness of the offense convicted of.

" 'Mitigating factors which I have considered are age of the defendant,

intelligence, school record or work record, prior criminal record, record since the offense in question, remorse, either drug addiction or alcohol involvement, mental problems, attitude, family support and community support.

" 'The law requires me to consider each and every single one of those factors in pronouncing the sentence and I have done so.

" 'I have given special consideration to five factors that I have noted here: the age of [the victim] a week after her sixteenth birthday; the age of [the defendant], a high school teenager; the lack of closure of this matter for a period of eleven years; the fact that this sentence is not punishing [the defendant] for any matters for which he is currently awaiting disposition and/or trial.

" 'The final factor that I have considered is the rules on proportionality.' " (Emphasis added.) *State* v. *Kelly*, supra, 256 Conn. 80 n.27.

[24] We cited, as exemplars of this majority approach: *United States* v. *Tracy*, 12 F.3d 1186, 1202 (2d Cir. 1993); *United States* v. *Medina-Cervantes*, 690 F.2d 715, 716–17 (9th Cir. 1982); *Frank* v. *Blackburn*, 646 F.2d 873, 884–85 (5th Cir. 1980), cert. denied, 454 U.S. 840, 102 S. Ct. 148, 70 L. Ed. 2d 123 (1981); *United States* v. *Araujo*, 539 F.2d 287, 291–92 (2d Cir.), cert. denied sub nom. *Rivera* v. *United States*, 429 U.S. 983, 97 S. Ct. 498, 50 L. Ed. 2d 593 (1976); *United States* v. *Thompson*, 476 F.2d 1196, 1201 (7th Cir.), cert. denied, 414 U.S. 918, 94 S. Ct. 214, 38 L. Ed. 2d 154 (1973); *Santana* v. *State*, 677 So. 2d 1339, 1340 (Fla. App. 1996); *State* v. *Brown*, 131 Idaho 61, 72–73, 951 P.2d 1288 (App. 1998); *State* v. *Eastman*, 691 A.2d 179, 184 (Me. 1997); *Mitchell* v. *State*, 114 Nev. 1417, 1428–29, 971 P.2d 813 (1998); *State* v. *Bonilla*, 127 N.M. 566, 570, 985 P.2d 168 (App. 1999); *State* v. *Fitzgibbon*, 114 Or. App. 581, 586–87, 836 P.2d 154 (1992); and *State* v. *Tiernan*, 645 A.2d 482, 487–88 (R.I. 1994). See *State* v. *Kelly*, supra, 256 Conn. 81–82.

[25] As examples of the minority approach, we cited: *United States* v. *Capriola*, 537 F.2d 319, 321 (9th Cir. 1976); *Hess* v. *United States*, 496 F.2d 936, 938–39 (8th Cir. 1974); *People* v. *Wilson*, 43 Colo. App. 68, 71, 599 P.2d 970 (1979); and *Johnson* v. *State*, 274 Md. 536, 542–43, 336 A.2d 113 (1975). See *State* v. *Kelly*, supra, 256 Conn. 82.

[26] We observed that, "[c]onfronted with claims similar to that of the defendant in this case, courts in other jurisdictions generally have required remarks by a trial judge to threaten explicitly a defendant with a lengthier sentence should the defendant opt for a trial, or indicate that a defendant's sentence was based on that choice." *State* v. *Kelly*, supra, 256 Conn. 82. We noted further that, when "a trial court employed more ambiguous language, however, courts generally have rejected claims that the trial court infringed on the defendant's rights." Id., 83; citing *State* v. *Tiernan*, 645 A.2d 482, 487 (R.I. 1994) (rejecting defendant's due process challenge to trial court's observation at sentencing that defendant had "required [the victim] to testify by exercising his right to stand trial" [internal quotation marks omitted]).

[27] See General Statutes (Rev. to 2003) § 53a-35a (6) and (8); see also General Statutes § 53a-59 (b) (first degree assault is class B felony); General Statutes § 53a-95 (b) (unlawful restraint in first degree is class D felony); General Statutes (Rev. to 2003) § 53a-40b (1) (ten year sentence enhancement for felonies committed while on pretrial release).

[28] In contrast, it would be inappropriate to use our supervisory power to adopt a new rule when doing so would mandate administrative or policy changes beyond the judicial milieu. See *State* v. *Lockhart*, supra, 298 Conn. 576–77 (deferring to legislature and declining to utilize supervisory power to adopt rule requiring confessions to be recorded to be admissible where its effect would go beyond judicial actors to require all law enforcement agencies to record confessions where defendants were protected by "procedures already in place to prevent the admission into evidence of involuntary or untrustworthy confessions, namely, the voluntariness determination that must be made by the trial court"); *State* v. *Marquez*, 291 Conn. 122, 165–67, 967 A.2d 56 (declining to utilize supervisory authority to mandate three procedural changes to identification procedures because "development and implementation of identification procedures 'should continue to be the province of the law enforcement agencies of this state' " to be evaluated judicially on case-by-case basis for unnecessary suggestiveness), cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

[29] It is well settled that "[t]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . .

In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . .

"[W]e recently clarified the two step framework under which we review claims of plain error. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . We made clear . . . that this inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal." (Internal quotation marks omitted.) *State* v. *Darryl W.*, 303 Conn. 353, 371–73, 33 A.3d 239 (2012); see also Practice Book § 60-5.

[30] A comprehensive catalog of cases wherein we have utilized our supervisory powers to articulate procedural rules in the criminal justice context is set forth in Justice Palmer's concurring opinion in *State* v. *Lockhart*, supra, 298 Conn. 601–603 n.12. Analysis of these cases, and several decided after *Lockhart*, reveals that they can be divided into two different categories. In the first category are cases wherein we have utilized our supervisory power to articulate a procedural rule as a matter of policy, either as holding or dictum, but without reversing convictions or portions thereof. In the second category are cases wherein we have utilized our supervisory powers to articulate a rule or otherwise take measures necessary to remedy a perceived injustice with respect to a preserved or unpreserved claim on appeal. Although we recently have noted that, "[o]ur cases have not always been clear as to the reason for this distinction"; *State* v. *Diaz*, 302 Conn. 93, 107 n.11, 25 A.3d 594 (2011); a review of the cases in both categories demonstrates that, in contrast to the second category, the first category consists of cases where there was no perceived or actual injustice apparent on the record, but the facts of the case lent themselves to the articulation of prophylactic procedural rules that might well avert such problems in the future.

Examples of the first category include: *State* v. *Medrano*, 308 Conn. 604, 631, 65 A.3d 503 (2013) (The court utilizes its supervisory power to "direct our trial courts in the future to refrain from instructing jurors, when a defendant testifies, that they may specifically consider the defendant's interest in the outcome of the case and the importance to him of the outcome of the trial. Instead, we instruct the trial courts to use the general credibility instruction to apply to a criminal defendant who testifies."); *State* v. *Pena*, 301 Conn. 669, 684, 22 A.3d 611 (2011) (declining to use supervisory power to overrule *State* v. *Huey*, 199 Conn. 121, 505 A.2d 1242 [1986], but stating that "we suggest that our trial courts in future sentencings refrain from expressing disagreement with the jury's verdict"); *State* v. *Ouellette*, 295 Conn. 173, 191–92, 989 A.2d 1048 (2010) (when state attests to witness' cooperation at that witness' sentencing hearing, sentencing court must "inquire into the nature of any plea agreement between the state and the witness, and any representations concerning that agreement made during the trials at which the witness testified"); *State* v. *Ledbetter*, 275 Conn. 534, 578–79, 881 A.2d 290 (2005) (requiring jury instruction concerning certain risks inherent in eyewitness identification procedures), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006); *State* v. *Padua*, 273 Conn. 138, 178–79, 869 A.2d 192 (2005) (requiring appeals court to address defendant's insufficiency of evidence claim first, if claim is properly briefed and sufficient record exists, even if another meritorious claim would result in new trial, because successful sufficiency claim would render new trial unnecessary); *Duperry* v. *Solnit*, 261 Conn. 309, 329, 803 A.2d 287 (2002) (when criminal defendant pleads not guilty by reason of mental disease or defect and state substantially agrees with defendant's plea, court must canvass defendant to ensure that plea is voluntary and made with full awareness of consequences); *State* v. *O'Neil*, 261 Conn. 49, 74–76, 801 A.2d 730 (2002) (revising and directing specific version of "Chip Smith" charge in future cases); *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002) (using supervisory power to avoid "danger of juror misunderstanding" by "direct[ing] our trial courts in the future to refrain from instructing jurors that one who uses a deadly weapon on the vital part of another 'will be deemed to have intended' the probable result of that act and that from such a circumstance the intent to kill properly may be inferred"); *State* v. *Griffin*, 253

Conn. 195, 209–10, 749 A.2d 1192 (2000) (prohibiting use of "two-inference" jury instruction as potentially misleading jury as to application of reasonable doubt standard); *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 125 (1999) (precluding jury instruction stating that reasonable doubt is not doubt suggested by " 'ingenuity of counsel' "); *State* v. *Schiappa*, 248 Conn. 132, 168, 728 A.2d 466 (prohibiting use of jury instruction that requirement of proof beyond reasonable doubt is rule intended to "protect the innocent and not the guilty" [internal quotation marks omitted]), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999); *State* v. *Coleman*, supra, 242 Conn. 541–42 (concluding that record indicated that reversal was not necessary after adopting rule requiring sentencing court, upon defendant's request, to articulate its reasons for imposing greater sentence after trial than that previously imposed under terms of withdrawn plea agreement); *State* v. *Gould*, 241 Conn. 1, 14–15, 695 A.2d 1022 (1997) (requiring that videotaped deposition testimony be replayed in open court, under supervision of trial judge, and in presence of parties and counsel, rather than in jury room, but holding no prejudice from failure to do so in that case); *State* v. *Patterson*, 230 Conn. 385, 397–400, 645 A.2d 535 (1994) (adopting unwaivable supervisory rule for future cases requiring trial judge to be present in court to oversee voir dire in criminal trial, but determining that defendant had waived his objection to judge's absence as constitutional matter); and *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166 (establishing procedure to be followed during jury selection when defendant raises claim that state has peremptorily excluded juror on basis of race pursuant to *Batson* v. *Kentucky*, 476 U.S. 79, 96–98, 106 S. Ct. 1715, 90 L. Ed. 2d 69 [1996]), cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

Examples of the second category include: *State* v. *Polanco*, 308 Conn. 242, 256–58, 61 A.3d 1084 (2013) (overruling merger approach articulated in *State* v. *Chicano*, 216 Conn. 699, 584 A.2d 425 [1990], cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 [1991], with vacatur approach when defendant is convicted of greater and lesser included offenses); *State* v. *Rose*, supra, 305 Conn. 605–606 (adopting rule of per se reversal when defendant is compelled to stand trial in prison garb); *State* v. *Connor*, 292 Conn. 483, 518–19, 533, 973 A.2d 627 (2009) (remanding case to trial court for findings after adopting rule requiring trial court, upon finding that mentally ill or incapacitated criminal defendant is competent to stand trial and to waive right to counsel at that trial, to make additional determination that defendant is competent to conduct trial proceedings without counsel); *State* v. *Gore*, 288 Conn. 770, 787–90, 955 A.2d 1 (2008) (upholding reversal of conviction after articulating rule that when criminal defendant seeks to waive right to trial by jury without written waiver, court must canvass defendant to ensure that waiver is knowing, intelligent and voluntary); *State* v. *Santiago*, supra, 245 Conn. 340 (remanding case for further proceedings after expanding scope of inquiry required for general allegations of juror misconduct when alleged misconduct results from racial bias of juror or jurors); *State* v. *Brown*, 235 Conn. 502, 528–30, 668 A.2d 1288 (1995) (ordering remand for further proceedings after adopting rule requiring trial judge presented with allegations of juror misconduct to conduct preliminary inquiry into such allegations); and *State* v. *Jones*, 234 Conn. 324, 347–50, 662 A.2d 1199 (1995) (requiring bifurcation of jury trial proceedings in capital felony cases when defendant is charged under General Statutes § 53a-54b [3], requiring proof of prior intentional murder conviction, and placing burden on state to demonstrate lack of need for bifurcated proceeding).

We have also utilized our supervisory powers in a very limited manner to address claims of and deter repeated instances of prosecutorial impropriety. For discussion of these cases, see footnote 31 of this opinion.

[31] As noted by the state, we also have utilized our supervisory authority to reach an unpreserved claim and reverse an individual conviction as a sanction "to redress repeated and deliberate misconduct by a prosecutor seeking to increase the likelihood of conviction even though that conduct does not necessarily require reversal as a due process violation. . . . [W]e pa[id] particular attention to the fact that the prosecutor knew or should have known that the conduct was improper and was part of a pattern of similar misconduct in other cases. We exercise[d] our supervisory authority in order to protect the rights of defendants and to maintain standards among prosecutors throughout the judicial system rather than to redress the unfairness of a particular trial. We [did] so in order to send a strong message that such conduct will not be tolerated." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 451–52, 797 A.2d 1088 (2002); see also *State* v. *Cohane*, 193 Conn. 474, 499–500, 479 A.2d 763 (relying on

supervisory powers in reversing conviction after finding violation pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 [1963], that merited reversal), cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); *State* v. *Ubaldi*, 190 Conn. 559, 576, 462 A.2d 1001 (utilizing supervisory power to reverse conviction because "[w]here a prosecutor . . . interjects remarks [during argument] deliberately intended to undermine the rulings of the trial court to the prejudice of the defendant, his conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal"), cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). Our use of our supervisory authority to resolve these claims in *Payne* and *Ubaldi* remains consistent with the unifying principle that the supervisory power should be utilized when necessary to protect the system's integrity; leaving the prosecutorial violations in those cases unaddressed would have adversely affected public perception of the criminal justice system—at least in those particular judicial districts.

[32] Compare *North Carolina* v. *Pearce*, 395 U.S. 711, 726, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969) (adopting presumption of vindictiveness when trial court imposes more severe sentence after new trial challenging original conviction, and "to assure the absence of such a motivation," requiring "that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear" and "be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding"), with *Alabama* v. *Smith*, 490 U.S. 794, 801, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989) (*Pearce* presumption of vindictiveness does not apply to higher sentence imposed after jury trial following successful challenge to guilty pleas).

[33] We did, however, note that *Coleman* did not raise any preservation issues because, although the defendant did not request an articulation of the second trial judge's reason for imposing a greater sentence, he did argue that the second trial judge could not impose a greater sentence, and the state did not object to the court's "consideration of the defendant's supervisory authority claim . . . ." *State* v. *Coleman*, supra, 242 Conn. 542 n.22.

[34] We further observed that this "rule places little, if any, additional burden on trial judges, who frequently are asked to articulate the reasons underlying particular sentencing decisions. Furthermore, the number of cases in which the rule will be applicable is likely to be extremely small." *State* v. *Coleman*, supra, 242 Conn. 542.

[35] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[36] We noted that, in contrast, under *Bordenkircher* v. *Hayes*, supra, 434 U.S. 363, the prosecutor may "[threaten] increased charges during the course of plea negotiations and mak[e] good on the threat if the defendant refuses to enter a plea"; *State* v. *Revelo*, supra, 256 Conn. 514; but emphasized that the trial court may not do so when participating in negotiations; the court may, however, apprise the defendant of the potential for a greater sentence should he not take the plea offer. See id., 516.

[37] "[I]n certain circumstances, it may be difficult to draw a meaningful distinction between 'enhancing' the punishment imposed on an accused who exercises a constitutional right and denying him the 'leniency' that he claims he would deserve if he waived that right. . . . Although the distinction between refusing to show leniency to an accused who insists on asserting a constitutional right and punishing an accused for asserting that right may, at times, be a fine one, there is no difficulty in discerning what occurred in this case: the trial court imposed a more severe sentence on the defendant solely because he asserted his right to a judicial ruling on his motion to suppress. In doing so, the trial court unfairly punished the defendant for exercising that right in violation of the federal due process clause." (Citation omitted.) *State* v. *Revelo*, supra, 256 Conn. 513–14.

This "fine distinction" between extending leniency to defendants who

plead guilty and penalizing those who exercise their right to a trial has recently been criticized as an analytical fiction that "changes merely the form of the problem, not the substance" and therefore "fails to alleviate the constitutional difficulties." C. Hessick & F. Hessick, "Recognizing Constitutional Rights at Sentencing," 99 Cal. L. Rev. 47, 64 (2011); see also id., 63 ("[t]he refusal to grant a defendant leniency that is given to others because the defendant performed some act—exercising his right to a jury—seems analytically indistinct from increasing that defendant's punishment because he performed that same act").

[38] In his concurring and dissenting opinion, Judge Bishop described our criminal justice system as "almost completely reliant on the plea bargaining process for the disposition of criminal cases," citing statistics from the Judicial Branch's biennial reports for the fiscal years of 2004–2005, 2005–2006, 2006–2007 and 2007–2008, demonstrating that approximately 95 percent of criminal cases are resolved by plea bargaining, rather than trial. *State* v. *Elson*, supra, 125 Conn. App. 393 n.7.

The most recent statistics for the fiscal years of 2010–2011 and 2011–2012 indicate that Judge Bishop's observation retains its currency. See Connecticut Judicial Branch, Biennial Report and Statistics 2010–2012, pp. 50–51 (indicating that 5.1 percent, or 177 out of 3450, of criminal cases were disposed via trial in 2010–2011 and 4.8 percent, or 164 out of 3386, of criminal cases were disposed via trial in 2011–2012), available at http://jud.ct.gov/Publications/BiennialReport2010-12.pdf (last visited April 21, 2014).

[39] We acknowledge that there is no indication, in the record or otherwise, that judicial comments of this ilk are a pervasive or repeated occurrence, either systemically or on the part of the trial judge in this case, and we emphatically do *not* insinuate to the contrary. Thus, our use of supervisory powers to reverse the sentence in this case is not one intended as a penalty or "message," such as that sent in the prosecutorial misconduct cases discussed in footnote 31 of this opinion. We emphasize, however, that we view the very nature of the trial judge's comments in this case as implicating the public's perception of the fairness of the judicial system, despite their apparent infrequency.

[40] For a more detailed discussion of *State* v. *Kelly*, supra, 256 Conn. 79–82, see part I B of this opinion.

[41] See, e.g., *State* v. *Santiago*, 305 Conn. 101, 164, 49 A.3d 566 (2012) (for due process purposes, "determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it . . . including both the characteristics of the accused and the details of the interrogation" [internal quotation marks omitted]); *State* v. *Marquez*, supra, 291 Conn. 161 ("any analysis of unnecessary suggestiveness must be conducted in light of the totality of the circumstances and must focus specifically on the presentation of the photographic array itself as well as the behavior of law enforcement personnel to determine if the procedure was designed or administered in such a way as to suggest to the witness that a particular photograph represents the individual under suspicion"); see also *State* v. *D'Antonio*, supra, 274 Conn. 693 n.22 (concluding that trial court's failure to follow rule set forth in *State* v. *Niblack*, 220 Conn. 270, 280, 596 A.2d 407 [1991], precluding judge who participated in plea bargaining from presiding at trial and sentencing is not due process violation that "require[s] per se reversal, but rather is protected by appellate review of the record for actual indications that the appearance of impartiality has been shattered"); see also *State* v. *D'Antonio*, supra, 680, 691–92 (violation of prophylactic *Niblack* rule, which "established a clear and bright line rule standing for the proposition that it is improper for a trial judge to preside over a defendant's trial after having participated actively in unsuccessful plea negotiations in the case" is not by itself plain error "requir[ing] reversal when the record demonstrates that the defendant otherwise has received a fair trial and sentencing before an impartial court, and that the core danger of judicial vindictiveness has not been realized").

[42] In his concurring opinion, Judge Robinson relied on our decision in *State* v. *Chambers*, 296 Conn. 397, 413–14, 994 A.2d 1248 (2010), in support of his conclusion that, in the absence of an articulation by the trial judge, the record was inadequate to sustain the Appellate Court's invocation of its supervisory powers. *State* v. *Elson*, supra, 125 Conn. App. 375–77. *Chambers* is, however, inapposite. In that case, we deemed the record inadequate to determine, under either *Golding* or our supervisory authority, whether an meeting in chambers between the court, the prosecutor and defense counsel was a critical stage of the proceeding at which the defendant had a constitutional right to be present. *State* v. *Chambers*, supra, 410–11. We

noted the fact-intensive nature of that particular inquiry and concluded that, in the absence of an articulation or rectification, the record was inadequate because the only evidence concerning "what transpired in chambers consist[ed] of two passing references by [the trial court] indicating merely that there had been such a meeting." Id., 413. This case is readily distinguishable from *Chambers* because the record in the present case contains a transcript of the sentencing proceeding that details exactly what happened in the courtroom while, in essence, the record in *Chambers* contained no information regarding what had transpired in the judge's chambers outside the presence of the defendant.

[43] We acknowledge that this does happen on rare occasion. See *State* v. *Kelly*, supra, 256 Conn. 82 ("I'm the kind of a judge where you get a fair trial . . . [but] [i]f I find that after the trial that you didn't have a defense at all, you're going to get the maximum, because you're playing games with me" [internal quotation marks omitted]), quoting *United States* v. *Cruz*, 977 F.2d 732, 733 (2d Cir. 1992); *United States* v. *Hutchings*, 757 F.2d 11, 13 (2d Cir. 1985) (The judge stated at the sentencing that the trial was "a 'total waste of public funds and resources . . . there was no defense in this case. [The defendant] was clearly and unquestionably guilty, and there should have been no trial.' "); *People* v. *Mosko*, 190 Mich. App. 204, 210, 475 N.W.2d 866 (1991) (" 'I am very concerned about this case . . . because it was a case that went to trial . . . [a]nd to get up on the stand and . . . [be] sanctimonious and you're self-righteous and you're guilty, that seems to me to be something that is—that is beyond [decent]' ").

[44] Like Judge Bishop, we do not discount the importance of victim impact evidence in the sentencing determination. See *State* v. *Elson*, supra, 125 Conn. App. 397 and 397–98 n.11; see also *State* v. *Coleman*, supra, 242 Conn. 546–48 (describing trial testimony and information in presentence investigation report about traumatic effects of sexual assault on victim). Nevertheless, the exercise of a defendant's right to a trial, which includes its concomitant effect on victims or witnesses from the act of having to testify, remains an improper factor to consider in sentencing. See *Abdul-Maleek* v. *State*, 426 Md. 59, 73–74, 43 A.3d 383 (2012) (remanding for resentencing because trial court's remarks referring to victim having to testify twice could lead to inference that defendant was being penalized for exercising his right to trial de novo in higher trial court); *People* v. *Jackson*, 474 Mich. 996, 707 N.W.2d 597 (2006) (remanding case for resentencing because although "crime was extremely brutal . . . the sentencing judge stated that she did not believe that [the] defendant was entitled to the same sentence as his accomplices, 'who were able to step up to the plate and say what they did and to admit their guilt,' while [the] defendant subjected the victims to 'having to testify' "); *State* v. *Ambriez*, Docket No. L-03-105137, 2004 WL 2334176, * 4–5 (Ohio App. September 24, 2004) (concluding that trial court improperly augmented sentence on basis of trial election because trial court stated that " 'there's no genuine remorse, because we had to proceed to trial; and obviously with your statement there's no genuine remorse, all of which makes recidivism more likely, thus would tip the scales on the side of [a] prison term' "); *State* v. *Reid*, 140 Or. App. 293, 299, 915 P.2d 453 (1996) (remanding for resentencing because, although "defendant's empathy—or lack thereof—is appropriate to a court's consideration of what sentence should be imposed," trial court's comments about putting daughter through trauma of trial resulted in "the exercise of his constitutional right to a trial [being] woven into the court's departure findings"); cf. *State* v. *Holmes*, Docket No. L-08-1034, 2009 WL 4270260, *3, 5 (Ohio App. November 20, 2009) (concluding that trial court's comments criticizing defendant for " 'violat[ing] [the victim] a second time by forcing us to go to trial in this case' " were improper but could not have affected sentence because "trial court made its comments after sentencing, without indicating whether its considerations were tied to the sentence" [emphasis omitted]); but see *State* v. *Farnham*, 479 A.2d 887, 892 (Me. 1984) ("[a]lthough [the] defendant had an absolute right to a trial . . . he cannot escape the fact that his exercise of those rights are probative of his attitude towards the victim and society"); *State* v. *Tiernan*, 645 A.2d 482, 487 (R.I. 1994) (rejecting due process challenge to trial court's observation at sentencing that defendant had " 'required [the victim] to testify' by exercising his right to stand trial").

[45] Like Judge Bishop, we are not "insensitive to the trauma realized by victims who must often relive the experiences of criminal acts inflicted upon them," and recognize that to "give consideration to a defendant who pleads guilty and thus saves the victim from having to testify is a hallmark of our plea bargaining system." *State* v. *Elson*, supra, 125 Conn. App. 397 n.11. To this end, the exercise of our supervisory authority in this appeal

is calculated to minimize the need for new sentencing proceedings, with a retraumatizing effect, that might result from inherently subjective appellate evaluations under *State* v. *Kelly*, supra, 256 Conn. 79–80, of trial courts' comments referring to a defendants' election to stand trial. The bright line rule that we articulate herein better illustrates the outer bounds of what trial judges permissibly may say in sentencing a defendant without raising due process concerns.

[46] In determining that resentencing is appropriate under our supervisory powers, we find instructive the balancing of interests utilized in determining whether to order a new trial under our supervisory powers as a remedy for prosecutorial impropriety; see footnote 31 of this opinion; namely, "the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Internal quotation marks omitted.) *State* v. *Diaz*, 302 Conn. 93, 107 n.11, 25 A.3d 594 (2011), quoting *State* v. *James G.*, 268 Conn. 382, 423, 844 A.2d 810 (2004).

Under these factors, and particularly with respect to the victim in this case, as the defendant points out, our remedy in this certified appeal will not require her to relive the trauma created by the defendant's actions. The victim's previous statement is on record and may be considered by the trial court at the defendant's resentencing, should she desire not to return to court.